ACCEPTED
15-24-00114-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/29/2025 5:22 PM
CHRISTOPHER A. PRINE
CLERK

No. 15-24-00114-CV

# In the Court of Appeals
# for the Fifteenth Judicial District

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/29/2025 5:22:17 PM
CHRISTOPHER A. PRINE
Clerk

CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS THE
EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN
SERVICES COMMISSION; MOLINA HEALTHCARE OF TEXAS, INC.;
AND AETNA BETTER HEALTH OF TEXAS, INC.,

*Appellants,*

*v.*

COOK CHILDREN'S HEALTH PLAN, TEXAS CHILDREN'S HEALTH
PLAN, SUPERIOR HEALTH PLAN, INC., AND
WELLPOINT INSURANCE COMPANY,

*Appellees.*

On Appeal from the
353rd Judicial District Court, Travis County

## BRIEF FOR APPELLANT CECILE ERWIN YOUNG

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

CORY A. SCANLON
Assistant Solicitor General
State Bar No. 24104599
Cory.Scanlon@oag.texas.gov

JEFFREY A. STEPHENS
Assistant Solicitor General

MOHMED I. PATEL
Assistant Attorney General

Counsel for Cecile Erwin Young

**ORAL ARGUMENT REQUESTED**

# IDENTITY OF PARTIES AND COUNSEL

**Appellants:**
Cecile Erwin Young, in her Official Capacity as the
Executive Commissioner of the Texas Health and Human Services Commission
Molina Healthcare of Texas, Inc.
Aetna Better Health of Texas, Inc.

**Appellate and Trial Counsel for Appellant Cecile Erwin Young:**
Ken Paxton
Brent Webster
William R. Peterson
William F. Cole
Cory A. Scanlon (lead counsel)
Jeffrey A. Stephens
Mohmed I. Patel
Jennifer Cook
Thomas Bevilacqua
Stephanie Criscione
Reuben Blum
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700
Cory.Scanlon@oag.texas.gov

**Appellate and Trial Counsel for Appellant Molina Healthcare of Texas, Inc.:**
Jason R. LaFond
State Bar No. 24103136
Cheryl Joseph LaFond
Scott Douglass & McConnico LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300
jlafond@scottdoug.com

**Appellate and Trial Counsel for Appellant Aetna Better Health of Texas, Inc.:**
Joseph R. Knight
State Bar No. 11601275
Ewell, Brown, Blanke & Knight LLP
111 Congress Avenue, 28th Floor
Austin, Texas 78701
(512) 770.4010
jknight@ebbklaw.com

**Appellees:**
Cook Children's Health Plan
Texas Children's Health Plan
Superior Health Plan, Inc.
Wellpoint Insurance Company

**Appellate and Trial Counsel for Appellee Cook Children's Health Plan:**

Amy Warr
Anna M. Baker
Alexander Dubose & Jefferson LLP
100 Congress Avenue, Suite 1450
Austin, Texas 78701-2709
(512) 482-9300
abaker@adjtlaw.com

Karen C. Burgess
Katie Dolan-Galaviz
Burgess Law PC
404 West 13th Street
Austin, Texas 78701-1825
(512) 482-8808
kburgess@burgesslawpc.com
kgalaviz@burgesslawpc.com

Matthew P. Gordon
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099
(206) 359-8000
mgordon@perkinscoie.com

**Appellate and Trial Counsel for Appellee Texas Children's Health Plan:**

Susan Feigin Harris
Warren S. Huang
Norton Rose Fulbright US, LLP
1550 Lamar, Suite 2000
Houston, Texas 77010
(713) 651-5151
susan.harris@nortonroseful-
bright.com
warren.huang@nortonroseful-
bright.com

Paul Trahan
Norton Rose Fulbright US, LLP
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
(512) 474-5201
paul.trahan@nortonrosefulbright.com

Thomas A. Coulter
Norton Rose Fulbright US, LLP
799 9th Street, NW, Suite 1000
Washington, D.C. 20001
(202) 662-0200
tom.coulter@nortonroseful-
bright.com

Jeff J. Wurzburg
Norton Rose Fulbright US, LLP
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
 (210) 224-5575
Jeff.wurzburg@nortonroseful-
bright.com

**Appellate and Trial Counsel for Appellee Superior Health Plan, Inc.:**

Rich Phillips
Holland & Knight, LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
rich.phillips@hklaw.com

Theresa Wanat
Holland & Knight, LLP
811 Main Street, Suite 2500
Houston, Texas 77002
(713) 821-7000
theresa.wanat@hklaw.com

Karen D. Walker
Holland & Knight, LLP
315 S. Calhoun Street, Suite 600
Tallahassee, Florida 32301
(850) 425-5612
karen.walker@hklaw.com

James E. Cousar
Holland & Knight, LLP
98 San Jacinto Blvd
Austin, Texas 78701
(512) 469-6112
james.cousar@hklaw.com

**Appellate and Trial Counsel for Appellee Wellpoint Insurance Co.:**

Robert F. Johnson III
Foley & Lardner, LLP
600 Congress Avenue, Suite 3000
Austin, Texas 78701
(512) 542-7000
rjohnson@foley.com

Benjamin J. Grossman,
Foley & Lardner, LLP
106 E. College Ave., Suite 900,
Tallahassee, Florida 32301
(850) 222-6100
bjgrossman@foley.com

Michelle Y. Ku
Brantley A. Smith
Foley & Lardner, LLP,
2021 McKinney, Suite 1600
Dallas, Texas 75201
(214) 999-3000
mku@foley.com
bsmith@foley.com

# Table of Contents

Page

Identity of Parties and Counsel ...................................................................i

Index of Authorities ...............................................................................vii

Record References ................................................................................xiv

Statement of the Case ...........................................................................xiv

Statement Regarding Oral Argument .........................................................xv

Issues Presented ...................................................................................xv

Introduction.........................................................................................1

Statement of Facts ................................................................................2

    I.   Legal Background ..........................................................................2

    II.  Factual Background ........................................................................4

    III. Procedural History ........................................................................7

Summary of the Argument.........................................................................8

Standard of Review ...............................................................................10

Argument............................................................................................10

    I.   The Trial Court Lacked Subject-Matter Jurisdiction Because Plaintiffs' Claims Are Unripe and Unexhausted. ....................................11

    II.  The Trial Court Erred in Temporarily Enjoining the Commissioner.................................................................................16

        A.  Plaintiffs lack a probable right to relief on their *ultra vires* claims.............................................................................17

            1.  Plaintiffs' *ultra vires* claims are not viable. .................................17

                a.  The Commissioner has absolute discretion to determine which contracts provide the "best value" to the State.........................................................................19

                b.  The manner of giving statutory preferences is not specified in the statutes and is within HHSC's discretion. ..............................................................22

                c.  Required disclosure of materials under PIA is not *ultra vires*. ...............................................................32

      d.    The trial court's order erroneously determined that the Commissioner violated the Texas due course provision. ................................................................34

      e.    The trial court justified the temporary injunction with statutory mandates that do not exist. ...........................35

    2.    Plaintiffs' claims seek an impermissible retrospective remedy. ...................................................................38

      a.    The procurement statutes contain no "redo" remedy...................................................................39

      b.    Redoing the procurement is fundamentally retrospective. ..........................................................41

B.    Equity favors the Commissioner. .....................................................43

C.    The temporary injunction fails to comply with the mandatory requirements of Rule 683. ..........................................................51

D.    The trial court erred by excluding evidence demonstrating HHSC's scoring methodology. .......................................................53

    1.    The consensus scoring rubrics are admissible and probative.......54

    2.    The exclusion is almost certain to result in an improper judgment. .................................................................56

Prayer .................................................................................................58

Certificate of Compliance ....................................................................58

# Index of Authorities

Page(s)

**Cases:**

*Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions,*
610 S.W.3d 911 (Tex. 2020) ................................................................ 11, 16

*Atl. Mut. Ins. Co. v. Middleman,*
661 S.W.2d 182 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.) .................. 57

*Blue & Gold Fleet, L.P. v. United States,*
492 F.3d 1308 (Fed. Cir. 2007) ................................................................ 41

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002) ................................................................ 43, 45

*Caffe Ribs, Inc. v. State,*
487 S.W.3d 137 (Tex. 2016) ................................................................ 56, 57

*City of Austin v. Util. Assocs., Inc.,*
517 S.W.3d 300 (Tex. App.—Austin 2017, pet. denied) ............................*passim*

*City of El Paso v. Heinrich,*
284 S.W.3d 366 (Tex. 2009) ................................................................ 17

*Cockrell Inv. Partners, L.P. v. Middle Pecos Groundwater Conservation Dist.,*
676 S.W.3d 677 (Tex. App.—El Paso 2023, pet. granted) ............................ 15

*Downer v. Aquamarine Operators, Inc.,*
701 S.W.2d 238 (Tex. 1985) ................................................................ 57

*Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.,*
977 F.2d 1472 (D.C. Cir. 1992) ............................................................ 23, 48

*Fireman's Fund Cnty. Mut. Ins. Co. v. Hidi,*
13 S.W.3d 767 (Tex. 2000) ................................................................ 40

*Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.,*
281 S.W.3d 215 (Tex. App.—Fort Worth 2009, pet. denied) .......................... 47

*GT & MC, Inc. v. Tex. City Ref., Inc.,*
822 S.W.2d 252 (Tex. App.—Houston [1st Dist.] 1991, writ denied) .............. 57

*Hall v. McRaven,*
508 S.W.3d 232 (Tex. 2017) ................................................ 17, 18, 20, 21

*Heckman v. Williamson County,*
369 S.W.3d 137 (Tex. 2012) ................................................................ 47

*Hensley v. State Comm'n on Jud. Conduct*,
    692 S.W.3d 184 (Tex. 2024) ............................................................ 14

*Honors Acad., Inc. v. TEA*,
    555 S.W.3d 54 (Tex. 2018) ......................................................... 30, 35

*Hous. Belt & Terminal Ry. v. City of Houston*,
    487 S.W.3d 154 (Tex. 2016) ..................................................17, 20, 26

*Indep. Capital Mgmt., L.L.C. v. Collins*,
    261 S.W.3d 792 (Tex. App.—Dallas 2008, no pet.) ..........................52

*InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*,
    715 S.W.2d 640 (Tex. 1986) .............................................................52

*In re J.F.C.*,
    96 S.W.3d 256 (Tex. 2002) ...............................................................10

*Jackson v. SOAH*,
    351 S.W.3d 290 (Tex. 2011) .............................................................33

*Jordan v. Landry's Seafood Rest., Inc.*,
    89 S.W.3d 737 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)................. 47

*Klumb v. Hous. Mun. Emps. Pension Sys.*,
    458 S.W.3d 1 (Tex. 2015) .................................................................27

*In re Luther*,
    620 S.W.3d 715 (Tex. 2021) (orig. proceeding) ......................... 52, 53

*M. Steinthal & Co. v. Seamans*,
    455 F.2d 1289 (D.C. Cir. 1971) ........................................................48

*Marble Falls ISD v. Scott*,
    275 S.W.3d 558 (Tex. App.—Austin 2008, pet. denied) ................... 15

*McCraw v. Maris*,
    828 S.W.2d 756 (Tex. 1992) .............................................................57

*McElroy v. Unifund CCR Partners*,
    No. 14-07-00661-CV, 2008 WL 4355276 (Tex. App.—Houston
    [14th Dist.] Aug. 26, 2008, no pet.)..................................................56

*Morath v. Kingsville ISD*,
    710 S.W.3d 918 (Tex. App.—15th Dist. 2025, no pet.).........................39, 40, 41

*N. Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*,
    296 S.W.3d 171 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ...................47

*Nettles v. GTECH Corp.*,
    606 S.W.3d 726 (Tex. 2020) ........................................................ 48, 49

*In re Newton*,
146 S.W.3d 648 (Tex. 2004) (orig. proceeding) .............................................. 45

*State ex rel. Off. of Att'y Gen. v. City of San Marcos*,
714 S.W.3d 224 (Tex. App.—15th Dist. 2025, pet. denied)........................ 10, 44

*Orion Constr. Corp. v. United States*,
125 Fed. Cl. 668 (2016) ..................................................................................... 35

*Palladian Partners, Inc. v. United States*,
783 F.3d 1243 (Fed. Cir. 2015) ......................................................................... 16

*Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*,
971 S.W.2d 439 (Tex. 1998) ..................................................................... 11, 12, 14

*Perkins v. Lukens Steel Co.*,
310 U.S. 113 (1940) ...........................................................................................32

*Point Energy Partners Permian, LLC v. MRC Permian Co.*,
669 S.W.3d 796 (Tex. 2023)............................................................................... 12

*Riner v. City of Hunters Creek*,
403 S.W.3d 919 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ................... 15

*Rivercenter Assocs. v. Rivera*,
858 S.W.2d 366 (Tex. 1993) ............................................................................. 47

*Smith v. Abbott*,
311 S.W.3d 62 (Tex. App.—Austin 2010, pet. denied)..................................... 16

*State v. Cent. Expressway Sign Assocs.*,
302 S.W.3d 866 (Tex. 2009) ........................................................................53, 57

*State v. Hollins*,
620 S.W.3d 400 (Tex. 2020)..............................................................................44

*State v. Loe*,
692 S.W.3d 215 (Tex. 2024)......................................................................... 10, 43

*State v. Tex. Pet Foods, Inc.*,
591 S.W.2d 800 (Tex. 1979) ............................................................................. 43

*In re State*,
711 S.W.3d 641 (Tex. 2024) (orig. proceeding) .....................................43, 45, 47

*In re Stetson Renewables Holdings, LLC*,
658 S.W.3d 292 (Tex. 2022) (orig. proceeding) ......................................... 39, 41

*Sw. Elec. Power Co. v. Lynch*,
595 S.W.3d 678 (Tex. 2020) .............................................................................. 12

*Sw. Pharmacy Sols., Inc. v. Tex. HHSC*,
No. 03-11-00802-CV, 2013 WL 3336868 (Tex. App.—Austin June 27, 2013, no pet.)................................................................... 2, 18

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ...................................................... 10

*In re Tex. DFPS*,
696 S.W.3d 240 (Tex. App.—San Antonio 2024, orig. proceeding)..................32

*Tex. Highway Comm'n v. El Paso Bldg. & Constr. Trades Council*,
234 S.W.2d 857 (Tex. 1950) ..........................................9, 31, 40-41

*Tex. Logos, L.P. v. TxDOT*,
241 S.W.3d 105 (Tex. App.—Austin 2007, no pet.) ..................... 1, 22

*TGS-NOPEC Geophysical Co. v. Combs*,
340 S.W.3d 432 (Tex. 2011) ...................................................... 21

*Turner v. Joshua ISD*,
583 S.W.2d 939 (Tex. App.—Waco 1979, no pet.)..........................46

*Vote.Org v. Callanen*,
39 F.4th 297 (5th Cir. 2022)......................................................49

*Waco ISD v. Gibson*,
22 S.W.3d 849 (Tex. 2000)........................................................ 12

*Webster v. Comm'n for Law. Discipline*,
704 S.W.3d 478 (Tex. 2024) ...................................................... 14

*Wilson v. Community Health Choice Texas, Inc.*,
607 S.W.3d 843 (Tex. App.—Austin 2020, pet. denied)............................ 23, 24

*Young v. Tex. Parks & Wildlife Dep't*,
No. 15-24-00052-CV, 2025 WL 1200947 (Tex. App.—15th Dist. Apr. 24, 2025, no pet. h.) ................................................................30

**Constitutuional Provisions, Statutes, and Rules:**

Tex. Const. art. I, § 13...............................................................34

28 U.S.C. § 1491(b)(1) ..............................................................40

Tex. Gov't Code:

ch. 533.................................................................................. 3, 4

ch. 536.................................................................................. 3, 4

ch. 540 .................................................................................... 3

ch. 543A .................................................................................. 3

ch. 552 .................................................................................. 33

§ 532.0051............................................................... xv, 2, 44

§ 533.002 ...................................................... 5, 18, 25, 37

§ 533.002(1)(B) ............................................................ 37, 44

§ 533.002(6) ................................................................. 37, 44

§ 533.003 ......................................................23, 26, 27, 28

§ 533.003(a)(1)......................................................... *passim*

§ 533.003(a)(3) ............................................................ 18, 29

§ 533.004 ..................................................................... 29, 30

§ 533.004(a) ............................................................... 23, 30

§ 533.004(a)(2) .......................................................... 18, 23

§ 533.0035................................................................ 6, 18, 36

§ 536.052 ..................................................................5, 25, 27

§ 536.052(a) ...........................................................18, 23, 28

§ 536.052(b) ............................................................ 3, 28, 44

§ 536.052(d)........................................... 18, 23, 24, 27, 28

§ 552.002 ..................................................................... 33

§ 552.221 .................................................................... 33

§ 552.301-.302 ......................................................... 33

§ 2155 .................................................................... 3, 4

§ 2155.076.................................................................... 3

§ 2155.144.............................................................. *passim*

§ 2155.144(c) ......................................3, 18, 19, 24, 26, 49

§ 2155.144(d) ......................................................18, 19, 20

§ 2155.144(d)(3).............................................................20

§ 2155.144(d)(5)...................................................... 20, 21

§ 2155.144(d)(7)..............................................................20

§ 2155.144(d)(11) ..................................................... 20, 38

§ 2155.144(n) .................................................... 3, 24, 25

Tex. Health & Safety Code:

ch. 62 ................................................................................................3

§ 62.051(a) ...........................................................xv, 2, 38, 44

§ 62.051(b) .......................................................................................38

§ 62.051(e) .............................................................................. 18, 36

§ 62.053(3) ...........................................................xv, 2, 38, 44

§ 62.055 .............................................................................18, 32, 38

§ 62.155 ..............................................................................18, 28, 38

§ 62.155(c)(1) ................................................................ 18, 38

Tex. Loc. Gov't Code:

§ 252.061 .......................................................................................40

§ 262.033 .......................................................................................40

1 Tex. Admin. Code:

ch. 391 ........................................................................................ 3, 34

§ 391.101 ...............................................................................18, 32, 37

§ 391.201(d) ..............................................................................24

§ 391.209 ..................................................................3, 18, 32, 37

§ 391.301 ........................................................................... 3, 7

§ 391.303(b) .................................................................................3

§ 391.305(a)(1) .....................................................................15, 25

§ 391.307(d) .............................................................................7

§ 391.307(d)(1) ................................................................ 18

34 Tex. Admin. Code § 20.208(d)(3) ...............................................33

Tex. R. Civ. P.:

683 ........................................................................xvi, 9, 51, 53

693 .......................................................................................43

Tex. R. Evid.:

803(6) ................................................................................. 54, 55

803(6)(A)-(C) ................................................................................54

803(6)(D) .......................................................................................54

803(6)(E) .......................................................................................54

902 ................................................................................................55

902(10) .................................................................................54, 55, 56

902(10)(B) .......................................................................................55

902(10)(b) .......................................................................................56

**Other Authorities:**

Act of May 29, 2023, 88th Leg., R.S., ch. 1170, §1, art. IX, sec.
17.09(e), 2023 Tex. Gen. Laws 3573.......................................................... 50-51

## RECORD REFERENCES

"CR" refers to the one-volume clerk's record of November 1, 2024. "RR" refers to the twenty-volume Reporter's Record. "Children's Plan.Mot," "Superior.Mot," and "Wellpoint.Mot" will be used to cite the motions for temporary relief filed on July 10, 2025, by Cook Children's Health Plan and Texas Children's Health Plan, Superior Health Plan Inc., and Wellpoint Insurance Company.

## STATEMENT OF THE CASE

*Nature of the Case*:

This is a suit for injunctive and declaratory relief against the Executive Commissioner of the Texas Health & Human Services Commission (HHSC) to halt the procurement of contracts for managed care services to administer the Texas Medicaid and Children's Health Insurance programs. Losing bidders brought various claims alleging that Appellant Cecile Erwin Young (the Commissioner) committed *ultra vires* acts in violation of various statutes governing the procurement of these services. CR.3308-84 (Cook Children's live petition), 3510-3817 (Superior), 4231-4715 (Wellpoint), 4716-5835 (Texas Children's).

*Course of Proceedings*:

The court consolidated the lawsuits, CR.2778, and the Commissioner filed a plea to the jurisdiction seeking dismissal of the suits, CR.2949-93. The court conducted a four-day evidentiary hearing to determine whether it should temporarily enjoin the Commissioner from completing the procurement and whether it should dismiss the case pursuant to the Commissioner's plea to the jurisdiction. CR.5875.

*Trial Court*:

353rd Judicial District Court, Travis County
The Honorable Laurie Eiserloh

*Trial Court Disposition*:

The trial court denied the plea to the jurisdiction and entered a temporary injunction against the Commissioner from completing the procurements. CR.5875-5884.

# Statement Regarding Oral Argument

This lawsuit should swiftly end now because the losing bidders lack a cognizable legal interest in halting the procurement any longer—as the Commissioner explained in her response to Plaintiffs' motion for temporary relief. The Commissioner requests that this case be set for oral argument on an expedited schedule, which will be helpful to the Court given the numerosity of parties and issues in this appeal.

# Issues Presented

The Commissioner is statutorily charged with administering and coordinating the provision of federal Medicaid health benefits and similar state programs to qualifying Texans. Tex. Gov't Code § 532.0051; Tex. Health & Safety Code §§ 62.051(a), .053(3). As part of the Commissioner's duties to oversee these programs, the Legislature has given her authority to procure contracts with companies to provide necessary services, thereby implementing a "Medicaid managed care system." Tex. Gov't Code § 532.0051. Under this system, third-party health insurance companies facilitate beneficiaries' care by administering the health plans and reimbursing providers participating in the programs. Tex. Gov't Code § 532.0051. When existing managed care organizations (MCOs) were not selected during the Commissioner's most recent reprocurement of these services, they sued the Commissioner to enjoin her from signing contracts with the winning bidders and thereby completing the procurements.

The issues presented are:

1. Whether the trial court lacked subject-matter jurisdiction over Plaintiffs' claims because:

a.  they are unripe; and

b.  Plaintiffs failed to establish viable *ultra vires* claims.

2.  Whether the trial court erred by temporarily enjoining the Commissioner from completing the procurement process because:

a.  Plaintiffs are unlikely to succeed on the merits of their claims that the Commissioner violated any procurement statute;

b.  the balance of equities weighs decisively in the Commissioner's (and therefore, the State's) favor;

c.  the trial court's order enjoining the procurement is void because it does not comply with Rule 683; and

d.  the trial court erred by excluding relevant evidence demonstrating the methodology HHSC evaluators used in scoring participating bidders.

# INTRODUCTION

This lawsuit is designed to entrench the interests of third-party MCOs that lost a competitive procurement to administer the State's Medicaid and Children's Health Insurance programs. The Legislature empowered HHSC to determine which bidders provide the "best value" for the State and can best serve the interests of low-income Texans who depend on these programs.

The disappointed bidders' demand to enjoin the Commissioner from "sign[ing], implement[ing], or execut[ing] any contract with any other entity for the STAR/CHIP products," CR.4763, is a quintessential suit to "control state action," which Texas courts have routinely dismissed under the *ultra vires* doctrine. *Tex. Logos, L.P. v. TxDOT*, 241 S.W.3d 105, 118 (Tex. App.—Austin 2007, no pet.) (collecting cases). It should go without saying that allowing jilted contractors to highjack the State's procurement process, entrench their own financial interests for the foreseeable future to the tune of billions of dollars, and bar the State from procuring necessary services for the most vulnerable Texans does not serve the public interest.

The trial court erred by denying the Commissioner's plea to the jurisdiction and enjoining her from completing the legislatively mandated procurement of MCO services, which elevated the losing bidders' expired contracts over the State's sovereign immunity and disrupted the orderly statewide administration of Medicaid and CHIP services. This Court should reverse and remand with instructions to dismiss the Plaintiffs' suits.

## I. Legal Background

HHSC oversees the administration of Texas Medicaid, which is a federal-state cooperative program that ensures the most impoverished Americans receive adequate healthcare. Tex. Gov't Code § 532.0051; *Sw. Pharmacy Sols., Inc. v. Tex. HHSC*, No. 03-11-00802-CV, 2013 WL 3336868, at *2-3 (Tex. App.—Austin June 27, 2013, no pet.). HHSC also oversees and implements Texas's Children's Health Insurance Program (CHIP), which is designed to ensure Texas children receive adequate health coverage that Medicaid and other programs may not provide. 12.RR.511. Since the mid-1990s, HHSC has primarily carried out these programs by procuring services from MCOs to administer the provision of benefits to Medicaid and CHIP beneficiaries and to reimburse medical providers participating in those programs. 6.RR.154. STAR (State of Texas Access Reform) is what HHSC calls its partnership program with MCOs for the provision of Medicaid services. 12.RR.511.

The Commissioner, as head of HHSC, is statutorily charged with the exclusive authority to "plan and direct Medicaid, including the management of the Medicaid managed care system and the development, procurement, management, and monitoring of contracts necessary to implement that system." Tex. Gov't Code § 532.0051. The Commissioner is similarly empowered by statute to manage CHIP and "coordinate the child health plan program with the Medicaid program." Tex. Health & Safety Code §§ 62.051(a), .053(3). Relevant here, the procurement process

for STAR/CHIP is governed by various standards articulated in chapters 533, 536,[1] and 2155 of the Government Code; chapter 62 of the Health & Safety Code; and title 1, chapter 391 of the Administrative Code.

The primary consideration when procuring MCO contracts is to "provide[] the best value to the agency" "by any procurement method approved by" HHSC. Tex. Gov't Code § 2155.144(c); 9.RR.313. And this objective controls over any potentially conflicting provisions. *Id.* § 2155.144(n). To evaluate MCO performance, HHSC "develop[s] quality of care and cost-efficiency benchmarks, including benchmarks based on a [MCO]'s performance with respect to reducing potentially preventable events and containing the growth rate of health care costs." Tex. Gov't Code § 536.052(b).

HHSC commences a procurement of MCO services by public notice of a Request for Proposals (RFP), which explains the services HHSC needs and invites qualifying organizations to respond. 1 Tex. Admin. Code § 391.209. When bidders respond to the RFP, they are on notice that their proposal is subject to public disclosure under the Public Information Act (PIA). 9.RR.343-45. A prospective bidder may submit a pre-bid protest if any of the RFP's requirements are inconsistent with state law. 1 Tex. Admin. Code § 391.303(b). Likewise, disappointed bidders may protest the contract award. *Id.* § 391.301 (citing Tex. Gov't Code § 2155.076).

---

[1] Chapters 533 and 536 have been recodified in chapters 540 and 543A, respectively. The versions in effect at the time of filing this lawsuit are used in this brief.

Beginning in 2018, the procurement process underwent years of reform and cross-agency collaboration with the Comptroller of Public Accounts, the State Auditor's Office, HHSC's Inspector General, and internal auditors. 9.RR.501. Because of the reforms, HHSC gave potential bidders the opportunity to meet with staff and give feedback on administering the solicitation. 9.RR.501. Mercer Health Benefits, LLC, a procurement consulting firm, also advised HHSC in developing and facilitating these reforms and the evaluation criteria for the procurement. 6.RR.136; 12.RR.284.

## II. Factual Background

After years of reform, input from throughout the State government, and feedback from managed-care stakeholders, HHSC initiated a procurement process and invited MCOs to bid for contracts to provide administration and beneficiary services through the STAR and CHIP programs. 9.RR.293-349. HHSC published the STAR & CHIP Managed Care Services RFP HHS0011152 on December 7, 2022. 9.RR.293. The RFP stated that HHSC would award contracts to qualified MCOs in one or more of thirteen defined service areas (SAs) based on population density. 9.RR.321-22. Under the terms of this procurement, bidders agreed that "HHSC shall make an award to the Respondent that, *in HHSC's sole determination*, provides the best value to the State of Texas as set out in this Solicitation." 9.RR.313 (emphasis added).

The RFP notified potential respondents that their proposals would "be evaluated in accordance with State law, including, but not limited to, applicable provisions of Chapters 533, 536, and 2155 of the Texas Government Code." 9.RR.313. HHSC formatted the procurement mindful of its overarching obligation to provide best

4

value to the State by developing "best value criteria," technical questions, and oral presentation scenarios to solicit the relevant information it needed under sections 533.002, 533.003(a)(1), 536.052, and 2155.144. Relevant here, the best value criteria and technical questions addressed historical quality performance of the RFP respondents. 6.RR.135. HHSC outlined these standards in both the RFP and HHSC's Statement of Work for the procurement. 5.RR.125; 9.RR.317, 520-24; 12.RR.284, 291-92.

Before the deadline for submissions, HHSC invited MCOs to attend a pre-proposal conference and submit questions about the RFP or assert possible errors or omissions in the RFP. 9.RR.303-04. If a respondent didn't raise a pre-solicitation objection to any error or defect in the RFP, the bidder was deemed to have waived the error or defect under the RFP's express terms. 9.RR.303. Only Wellpoint protested these specifications before any bids were entered. Wellpoint.Mot.5. Wellpoint generally complained that "it appears that HHSC intends to award mandatory contracts pursuant to the RFP for both the STAR program . . . *and* the CHIP program . . . in violation of the law and in an anti-competitive manner." 9.RR.360. The Commissioner denied Wellpoint's protest as to the solicitation. 9.RR.360.

For over a year, HHSC evaluated the MCOs' responses before issuing the Notice of Intent to Award (NOIA) contracts to winning bidders. 12.RR.283-96. As part of their response, MCOs could rank specific SAs according to preference, subject to the maximum number of MCOs that could receive a contract in each SA. 9.RR.315. HHSC's process included evaluating and scoring written responses to technical questions and inviting MCOs to make oral presentations. 12.RR.286-87. Eighteen

5

bidders responded to the STAR/CHIP RFP, and evaluators reviewed the written responses to the technical questions before the oral presentations. 12.RR.286. HHSC deemed all MCOs to be in the "Competitive Range" for selection and oral presentations, meaning there was a likelihood that they would be considered for the SAs they ranked. 12.RR.287-88. HHSC then evaluated the oral presentations based on the MCO's responses to four separate scenarios which covered the following topics: Oversight and coordination with subcontractors; Maternal mortality and morbidity; Coordination with Dental Maintenance Organizations; and Preventive care rates. 9.RR.318-19. HHSC certified each of the applicants as reasonably capable of fulfilling their proposals under Government Code section 533.0035 based on this comprehensive process. 12.RR.294.

The evaluation teams, which consisted of subject matter experts, reviewed all responses and assigned scores consistent with the published scoring guide. 12.RR.286. The evaluators trained extensively on scoring proposals and conducted practice exercises to rehearse the scoring methodology. CR.3365 (Cook Children's live petition); 9.RR.427-71. Evaluators reviewed the proposals against relevant criteria and then held Consensus Scoring Meetings to discuss the responses, justify their decisions, and unanimously assign scores. 9.RR.299, 314. After evaluating all responses and determining final weighted scores, HHSC assigned MCOs to SAs by order of ranked preference. 9.RR.322-23; *e.g.*, CR.3162, 3166, 3172, 3177, 3178 (technical weighted scores based on best-value criteria and technical-question responses), 3288 (final weighted scores after oral presentations).

After evaluating the bidders' offers, HHSC issued a NOIA identifying the MCOs to which it intended to award contracts in each SA. During the procurement, HHSC considered the past performance of all MCOs who recounted their past performance in their bid. 6.RR.177.

## III. Procedural History

Once they were notified that they were not selected to provide MCO services in their preferred SAs, Plaintiffs filed bid protests against HHSC's procurement under 1 Tex. Admin. Code § 391.301; *see* 9.RR.520 (Cook Children's), 525 (Superior), 532 (Texas Children's), 540 (Wellpoint). Kay Molina, the Deputy Executive Commissioner for Procurement and Contract Services carefully considered the issues raised by the losing bidders and found no violation of statutory requirements. 9.RR.524. Plaintiffs then appealed to the Executive Commissioner, the only defendant in this suit. 1 Tex. Admin. Code § 391.307(d); *e.g.* 9.RR.546. As the Commissioner testified, those appeals remain pending before HHSC:

"Q And as part of that, you still need to determine for yourself –

"A Yes, sir.

"Q -- whether the State complied with the law?

"A Yes, sir."

6.RR.133. The Commissioner testified that the contracts with Plaintiffs reached the end of their terms, and due to this litigation, she has been required to extend the current MCO contracts for the foreseeable future. 6.RR.145.

Before the bid protests could be resolved through the HHSC's administrative process, each Plaintiff separately sued, alleging that the Commissioner acted *ultra*

7

*vires* in the procurement process. CR.3308-84 (Cook Children's live petition), 3510-3817 (Superior), 4231-4715 (Wellpoint), 4716-5835 (Texas Children's). The trial court consolidated the lawsuits, CR.2778, and conducted a four-day evidentiary hearing to determine whether it should temporarily enjoin the Commissioner from signing contracts or grant her plea to the jurisdiction. CR.5875. The court ordered the Commissioner,

> and all other persons or entities in active concert or participation with [her,] [to] refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP.

CR.5883. The Court ordered the same relief as to the STAR Kids RFP. CR.5883. Presently, the entire statewide procurement process for STAR+, CHIP, and STAR Kids is on hold pending the outcome of this litigation.

## Summary of the Argument

The trial court erred in several ways. The trial court erred by denying the Commissioner's plea to the jurisdiction and by granting the temporary injunction because it lacked subject-matter jurisdiction and Plaintiffs failed to establish a probable right to relief: Their claims are not justiciable, and it is highly unlikely that those claims will succeed on the merits.

I.   Plaintiffs' claims are not ripe because they have not exhausted the existing and available administrative process. Instead, Plaintiffs seek to bypass the agency bid-protest process—which, as all agree, is still awaiting the Commissioner's consideration. In fact, if the trial court took the correct course and denied the request

8

for a temporary injunction, Plaintiffs could have still recovered the very same relief they seek from this Court in the administrative proceeding. That should give this Court pause: A court should not issue a judgment that has no binding force (i.e., an advisory opinion), yet that is exactly what Plaintiffs ask this Court to do.

**II.** Regarding success on the merits, (**A**) Plaintiffs have no viable *ultra vires* claims. Without a cognizable right to dictate the Commissioner's procurement decisions, Plaintiffs pursue an improperly prosecuted *ultra vires* action. But even if Plaintiffs can pursue *ultra vires* relief, those claims fail because HHSC complied with every applicable statutory requirement.

(**B**) Equity also favors the Commissioner. Plaintiffs were not irreparably harmed just because their companies lost a competitive, fair bidding process and missed an opportunity to contract with the State. Plaintiffs' quest for a mulligan ignores the well-settled principle that, when it comes to procurements, those with the delegated authority to secure goods and services on behalf of the State may "determine those with whom it will deal." *Tex. Highway Comm'n v. El Paso Bldg. & Constr. Trades Council*, 234 S.W.2d 857, 860 (Tex. 1950). The Commissioner squarely possesses that authority here.

(**C**) Further, the trial court's order violates Rule 683. Not only did the court incorrectly find violations where none exist, but it also omitted descriptions with the requisite specificity, invented out of whole cloth statutory prohibitions not found in the governing texts, and concluded the Commissioner violated them. Should the Court find the trial court had subject-matter jurisdiction, it should reverse the temporary injunction order because it is void.

9

(**D**) The trial court also erroneously excluded relevant evidence demonstrating how HHSC's evaluators determined statutory "best value" to the agency. This evidence is probative of whether the Commissioner acted within her statutory authority to award the contracts to the winning bidders and shows why Plaintiffs' *ultra vires* claims are invalid.

For these reasons, the trial court should have granted the Commissioner's plea to the jurisdiction and dismissed the suit in its entirety, or—at a minimum—refused to enjoin the procurement because Plaintiffs lack entitlement to extraordinary relief.

## Standard of Review

A trial court's order ruling on a plea to the jurisdiction is reviewed de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).

An order granting a temporary injunction is reviewed for an abuse of discretion. *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024). A trial court's failure "to analyze or apply the law correctly will constitute an abuse of discretion," because the court "has no discretion to determine what the law is." *State ex rel. Off. of Att'y Gen. v. City of San Marcos*, 714 S.W.3d 224, 234 (Tex. App.—15th Dist. 2025, pet. denied) (citation modified).

A trial court's ruling on the admissibility of the evidence is reviewed for abuse of discretion. *In re J.F.C.*, 96 S.W.3d 256, 285 (Tex. 2002).

## Argument

At the outset, the Court should reverse and render judgment dismissing the suits because the trial court lacked subject-matter jurisdiction for reasons of ripeness and

10

lack of a viable *ultra vires* claim. There is no dispute that the agency generally enjoys sovereign immunity from suit, which has not been waived. Despite the trial court's cursory conclusions, Plaintiffs cannot support their claims that the Commissioner acted illegally. Thus, Plaintiffs are unlikely to succeed on the merits of their *ultra vires* claims, or their claims that the procurement must be scrapped and begun again.

"Because it is dispositive of this appeal, [this Court should] consider first whether the plaintiffs have established a probable right to relief." *Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 917 (Tex. 2020) (per curiam). To establish a right to relief at this preliminary stage, Plaintiffs must demonstrate that their claim is justiciable and will probably succeed on the merits. *See id.* ("At this preliminary stage, the plaintiffs must demonstrate both standing to bring their claims and that the claims will probably succeed on the merits in order to establish a probable right to relief.").

Plaintiffs have not (indeed, cannot) make that showing: (I) their claims are not ripe because Plaintiffs did not exhaust the bid-protest process and (II) their claims are highly unlikely to succeed on the merits because they have not pleaded or otherwise established a proper *ultra vires* action—especially where the Commissioner, within her broad discretion, closely considered and followed each statutory mandate.

## I. The Trial Court Lacked Subject-Matter Jurisdiction Because Plaintiffs' Claims Are Unripe and Unexhausted.

The trial court lacked subject-matter jurisdiction over Plaintiffs' unripe and unexhausted claims. Ripeness "is a threshold issue that implicates subject matter jurisdiction," *Patterson v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 971 S.W.2d 439,

442 (Tex. 1998), which as the party invoking the jurisdiction of the courts, Plaintiffs must prove, *see Waco ISD v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000). "[L]ike standing, [ripeness] emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson*, 971 S.W.2d at 442. But "[w]hile standing focuses on the issue of *who* may bring an action, ripeness focuses on *when* that action may be brought." *Gibson*, 22 S.W.3d at 851.

Specifically, in evaluating ripeness, courts must consider "whether, at the time a lawsuit is filed, the facts are sufficiently developed so that an injury has occurred or is likely to occur, rather than being contingent or remote." *Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 812 (Tex. 2023) (citation modified). "If the plaintiff's claimed injury is based on 'hypothetical facts, or upon events that have not yet come to pass,' then the case is not ripe, and the court lacks subject matter jurisdiction." *Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020) (quoting *Gibson*, 22 S.W.3d at 852). Courts that prematurely decide an unripe claim have violated constitutional limitations on rendering advisory opinions. *Gibson*, 22 S.W.3d at 852.

**1.** No party disputes that every Plaintiff has a pending bid protest, and that the Commissioner has yet to determine whether HHSC complied with all applicable procurement standards. The Commissioner's testimony, which Plaintiffs' counsel elicited, showed that no injury "has occurred or is likely to occur." *See Point Energy*, 669 S.W.3d at 812:

"Q And as part of that, you still need to determine for yourself –

"A Yes, sir.

"Q -- whether the State complied with the law?

"A Yes, sir."

6.RR.133. The Commissioner also said, "assuming the Court will allow me to move forward, I would then finish the appeals process, the review of the appeals, and make a decision, *one or the other*, on each of the individual appeals . . . . I would move forward . . . . *Depending on how those appeals come out*." 6.RR.132 (emphases added).

But Plaintiffs seek to sidestep that administrative process. Indeed, they sought and received this improper injunction before the Commissioner could even consider their administrative appeal. At this moment, the Commissioner is enjoined from "further[ing] the procurement or contracting process for the STAR & CHIP RFP." CR.5883. Nor can she "proceed[] with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP." CR.5883. Plaintiffs have thus manufactured the catch-22 that destroys this Court's jurisdiction: The injunction prevents the Commissioner from considering Plaintiffs' administrative appeals, which in turn means this case is not ripe because the Commissioner's decision could moot this entire case.

More to the point, whether the Commissioner will proceed with HHSC's existing procurements or alter them in some way is far from certain. HHSC's history with MCO procurement demonstrates as much. In 2020, for example, HHSC altered a procurement due to irregularities in the applied scoring procedures. 5.RR.180. And even now, there remains the chance that the Commissioner will agree with Plaintiffs and decide the pending administrative appeals in their favor. After all, the Court must presume that the Commissioner will consider these appeals in good faith. *See*

13

*Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 501 (Tex. 2024) (holding that state actors are entitled to a "presumption of regularity, good faith, and legality" when answering allegations of wrongdoing). Of course, here the Commissioner need not rely on this presumption—her uncontroverted testimony is that the procurement's execution depends on how she decides these appeals. 6.RR.132.

Tellingly, the trial court's order is repeatedly phrased in the future tense, as the court found that HHSC's "intended contract awards" "will constitute *ultra vires* acts," because they "will fail" to comply with certain statutory and regulatory requirements. CR.5876-78. Likewise, every Plaintiff couches their request for relief in speculative, uncertain language that renders their claims nonjusticiable under ripeness principles. *See* Children's Plans.Mot.18 (hoping to "foreclose even the *possibility* of [the] unacceptable result") (emphasis added); Wellpoint.Mot.14 (adopting same argument); Superior.Mot.2 ("If the Executive Commissioner authorizes HHSC to execute contracts based on the intended contract awards, her action *will be ultra vires*.") (emphasis added). These assertions lay bare the textbook ripeness problem plaguing Plaintiffs' suits: By gesturing at what the Commissioner *may* do with their administrative appeals, all Plaintiffs assert is "the occurrence of contingent future events that may not occur as anticipated[,] or may not occur at all." *Patterson*, 971 S.W.2d at 444. For ripeness, that is not enough.

**2.** Likewise, the Court should dismiss Plaintiffs' claims because Plaintiffs have not exhausted their available administrative remedies, as the Commissioner argued below. CR.2986; *see Hensley v. State Comm'n on Jud. Conduct*, 692 S.W.3d 184, 194 (Tex. 2024) (holding that when an available administrative remedy "may moot the

14

claim . . . the claim is barred"). That bedrock administrative-law requirement applies not only to protests of the NOIA, but to the solicitation Plaintiffs so adamantly insist the Commissioner unlawfully implemented. 1 Tex. Admin. Code § 391.305(a)(1).

When a plaintiff alleges that an agency has incorrectly applied the law governing the subject of its dispute, that claim is not ripe until the plaintiff avails himself of all available administrative recourse. *E.g.*, *Riner v. City of Hunters Creek*, 403 S.W.3d 919, 923-24 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *cf. Marble Falls ISD v. Scott*, 275 S.W.3d 558, 567 (Tex. App.—Austin 2008, pet. denied) (stating that APA challenges are not ripe while a motion for rehearing before the agency remains pending); *Cockrell Inv. Partners, L.P. v. Middle Pecos Groundwater Conservation Dist.*, 676 S.W.3d 677 (Tex. App.—El Paso 2023, pet. granted) (reviewing whether administrative remedies were exhausted before judicial review was sought).

In *Riner*, for example, the court of appeals held that, because a plat owner had case-mooting administrative relief still pending, the plat owner's claims against the City were premature. 403 S.W.3d at 923-24. At any point during the appeal, the plat owner could have recovered administrative relief. But rather than patiently await an administrative decision, the plat owner sought judicial relief too early. That same logic squarely applies here. As the Commissioner has testified, she has not yet determined whether the procurement "complied with the law." 6.RR.133.

Like the court of appeals in *Riner*, no court has jurisdiction over Plaintiffs' premature claims. Plaintiffs also acceded to the terms of the solicitation when they submitted bids without protest in the hope of being awarded new multi-billion-dollar

15

contracts. Their failure to protest, and Wellpoint's decision to proceed with competing for the contracts despite its protest, renders their present claims barred. *See Palladian Partners, Inc. v. United States*, 783 F.3d 1243, 1255-56 (Fed. Cir. 2015) (barring claim when bidder fails to appeal decision regarding the solicitation terms).

3. Plaintiffs' invocation of *Smith v. Abbott*, 311 S.W.3d 62 (Tex. App.—Austin 2010, pet. denied), and the *ultra vires* doctrine as a panacea for these defects fails. In *Smith*, the plaintiff alleged that a state agency (there, the Attorney General) could not delegate its statutory authority to suspend drivers licenses to the State Office of Administrative Hearings because SOAH had no such statutory authority. *Id.* at 68-69. Unlike the Commissioner's authority to procure the MCO contracts, which is clearly statutorily vested, *Smith* dealt with SOAH's general authority to finally adjudicate suspension disputes despite the statutes delegating that authority to the Attorney General. *Id.* at 81. *Smith* is thus inapposite.

## II. The Trial Court Erred in Temporarily Enjoining the Commissioner.

An applicant for temporary injunction "must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable imminent, and irreparable injury in the interim." *Anti-Defamation League*, 610 S.W.3d at 916 (citation modified). Plaintiffs did not (and cannot) satisfy the hefty burden they carry to establish these elements. *See id.* In holding otherwise and granting Plaintiffs extraordinary relief, the trial court abused its discretion.

## A. Plaintiffs lack a probable right to relief on their *ultra vires* claims.

Far from *ultra vires*, the Commissioner's conduct was comfortably within her broad statutory authority. But even if this Court disagrees, Plaintiffs' claims still fail because they seek an impermissibly retrospective remedy that runs afoul of sovereign immunity.

### 1. Plaintiffs' *ultra vires* claims are not viable.

Acting within the limits of her broad authority and discretion, the Commissioner did not act *ultra vires*. "To fall within [the] *ultra vires* exception [to sovereign immunity], a suit must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). "An *ultra vires* claim based on actions taken 'without legal authority' has two fundamental components: (1) authority giving the official some (but not absolute) discretion to act and (2) conduct outside of that authority." *Hall v. McRaven*, 508 S.W.3d 232, 239 (Tex. 2017) (citing *Hous. Belt & Terminal Ry. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016)).

Courts must not reduce the *ultra vires* inquiry to whether the officer simply made a mistake or "got it wrong"—especially when that person is statutorily empowered to make that decision. *City of Austin v. Util. Assocs., Inc.*, 517 S.W.3d 300, 310 (Tex. App.—Austin 2017, pet. denied) (citing *Hall*, 508 S.W.3d at 232). Doing so by "requir[ing] nothing more than an identifiable mistake would not be a narrow exception to immunity: it would swallow immunity." *Hall*, 508 S.W.3d at 242-43. To prove that the Commissioner acted without legal authority, Plaintiffs must show that the

Commissioner "exercised discretion without reference to or in conflict with the constraints of the law authorizing [her] to act." *Id.* at 242 (citation modified).

They cannot. After listing thirteen bullet points with no corresponding factual findings, the trial court concluded that the Commissioner violated no less than sixteen different statutory and regulatory provisions, in addition to the Texas Constitution's due course provision. CR.5877-78. Each was error. At the outset, the trial court's order entirely ignores that the touchstone requirement of the procurement process is that the contract "provide[] the best value to the agency." Tex. Gov't Code § 2155.144(c). And it disregards that the Legislature vested the discretion to make that determination in *HHSC*, who "may consider all relevant factors in determining the best value." *Id.* § 2155.144(d). That is a statutory scheme vesting absolute discretion in the agency; it therefore cannot provide any basis for an *ultra vires* claim.

The trial court nevertheless identified a host of purported statutory violations that fall into three general categories: (i) preference standards, *see* Tex. Gov't Code §§ 533.003(a)(1), .003(a)(3), .004(a)(2), 536.052(a), .052(d); *see also* Tex. Health & Safety Code § 62.155(c)(1); (ii) disclosure and confidentiality obligations, *see* 1 Tex. Admin. Code §§ 391.101, .209, .307(d)(1); and (iii) other guidelines and procedures that HHSC follows when screening, evaluating, and certifying candidates for the procurement, *see* Tex. Gov't Code §§ 533.002, 533.0035, 2155.144(c), (d); Tex. Health & Safety Code §§ 62.051(e), .055, .155. But a plain reading of the relevant text undermines the court's legal conclusions, and none of the evidence adduced at the hearing supports a single factual finding made. Additionally, Plaintiffs convinced

18

the court to identify prohibitions and mandates unmoored from these provisions and then enter conclusory findings that the Commissioner violated them.

### a. The Commissioner has absolute discretion to determine which contracts provide the "best value" to the State.

In granting extraordinary relief, the trial court ignored that the Legislature vested the Commissioner with absolute discretion to determine those MCO contracts that provide the "best value to the agency." Tex. Gov't Code § 2155.144(c), (d). That alone is fatal to Plaintiffs' *ultra vires* claims.

Section 2155.144 vests the Commissioner with broad authority over a discretion-laden procurement process. Section 2155.144(c) makes the ultimate goal of HHSC's procurement process obtaining a contract "that provides the best value to the agency." Tex. Gov't Code § 2155.144(c). And, in turn, section 2155.144(d) supplied a list of factors that HHSC "*may* consider" to the extent they are relevant to determining "best value to the agency," and which must be documented if considered. *Id.* § 2155.144(c)-(d) (emphasis added). On its own terms, section 2155.144(d) does not require consideration of *every* enumerated factor—instead, it allows the Commissioner to decide when those factors are "relevant" to determining "best value"—a judgment-laden inquiry wholly within the Commissioner's discretion.

And when making this "best value" judgment, the Commissioner may consider, among other things, "the quality and reliability of . . . [and] total long-term cost to the agency of acquiring the vendor's goods or services," as well as "any other factor relevant to determining the best value for the agency in the context of a particular

acquisition." *Id.* § 2155.144(d)(3), (7), (11). This is a statutory scheme that vests "absolute discretion" in the Commissioner to weigh and apply the factors. *Hall*, 508 S.W.3d at 241. The Commissioner's "best value" judgment is just that: a judgment within the Commissioner's sole discretion. It does not provide any basis for an *ultra vires* claim. *See id.* After all, sovereign immunity "bars [*ultra vires*] suits complaining of an exercise of *absolute* discretion." *Hous. Belt*, 487 S.W.3d at 163. And while an *ultra vires* suit will lie to challenge a government official's "exercise of judgment or *limited* discretion" when exercised "without reference to or in conflict with the constraints of the law authorizing the official to act," *id.*, Plaintiffs cannot show that the Commissioner's best-value determination violated any law authorizing her to act.

Indeed, the only provision of section 2155.144 that the trial court found that the Commissioner would purportedly violate is section 2155.144(d)(5)—"past vendor performance," which is one of several factors the Commissioner "*may* consider" (among others) when determining best value. CR.5877. Although the injunction's conclusory finding provides no explanation, Plaintiffs argued that because HHSC acknowledged past performance as a relevant factor under section 2155.144, the agency was required to document its consideration, which HHSC allegedly didn't do. Children's Plans.Mot.35-36.

That argument is wrong on the law and the facts. For starters, Plaintiffs' argument overlooks the statutory text: To the extent HHSC might heed past performance, it "*may* consider . . . indicators of probable vendor performance under the contract such as past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability

to provide reliable maintenance agreements." Tex. Gov't Code § 2155.144(d)(5) (emphasis added). There is no mandate to look to "past performance" in isolation, and the text and context of section 2155.144 instead evince the Commissioner's absolute statutory discretion to disregard past performance altogether in favor of indicators of future performance (though, as explained below, HHSC did not). *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011).

Regardless, James Ramirez, Deputy Executive Commissioner responsible for Medicaid & CHIP Services (MCS) procurements, testified that past performance *was* documented in the procurement file:

> "Q. But there is no specific documentation showing the agency's consideration of relevant factors including past performance; correct?
>
> "A. Outside of the entirety of the procurement file, that is correct."

5.RR.227. And Kay Molina testified that "if past performance was [in the response], it was considered." 5.RR.110. Even after assuming that past performance was a mandatory statutory requirement, HHSC considered it to the extent it deemed appropriate and to the extent the MCOs brought their past performance to evaluators' attention. Positive past performance may result in more favorable treatment, or it could not. But that hazy state of play cannot form the basis for an *ultra vires* claim, because how HHSC weighs past performance is entirely within the Commissioner's absolute discretion. *Hall*, 508 S.W.3d at 241.

Not only did HHSC consider past performance, but, by Plaintiffs' own admission, it also documented how it declined Mercer's recommendation to weigh past

performance. 5.RR.181, 253; 9.RR.260; Children's Plans.Mot.35 ("HHSC inexplicably rejected its hired consultant's recommendation to assign 10% of a bidder's score to past performance."). Plaintiffs cannot succeed on an *ultra vires* claim to compel the Commissioner to weigh certain best-value criteria more favorably than others because these are questions requiring judgment and deliberation entirely within her statutory authority, *see Util. Assocs.*, 517 S.W.3d at 310, and she is immune from suits like this that seek to control state action. *See, e.g.*, *Tex. Logos*, 241 S.W.3d at 121-22 ("[A] declaratory claim that would be proper if asserted to compel the state to act within its statutory powers prospectively may nonetheless be barred by sovereign immunity to the extent it alleges past statutory violations that implicate a right to money damages."). This Court should reject Plaintiffs' proposed sore-loser doctrine of state procurement law.

\* \* \*

The trial court's injunction appears premised on Plaintiffs' unproven assertion that the Commissioner "did not implement [the statutes] at all." *E.g.*, Children's Plans.Mot.33. But that contradicts the express terms of the RFP and the procedures HHSC and its evaluators followed, which every bidder accepted when they submitted proposals. 5.RR.125; 9.RR.313, 317, 520-24; 12.RR.284, 291-92. Here, the evidence conclusively shows HHSC's compliance with all applicable statutes.

### b. The manner of giving statutory preferences is not specified in the statutes and is within HHSC's discretion.

The trial court also held that Plaintiffs have a probable right to relief because, if HHSC does not award the contracts to Plaintiffs, the agency will likely deprive them

of certain statutory preferences that they are entitled to in the procurement process. CR.5877-78 (citing Tex. Gov't Code §§ 533.003, 533.004(a)(2), 536.052(a),(d)); *see also* Superior.Mot.13 (same). But that conclusion fails because Plaintiffs did not (and cannot) prove standing. And even if they could, their claims still fail considering the broad discretion that the statutes give HHSC. Plaintiffs offer no meritorious counterarguments.

1. For starters, Plaintiffs lack standing to complain about the application of the statutory-preference provisions, which are waived and inapplicable. The trial court never found that any of the Plaintiffs were deprived a statutory preference over a winning MCO—especially not one to which they were otherwise entitled. In that sense, they have no standing to complain because they cannot show that the Commissioner's alleged failure to apply a statutory preference caused them to be passed over in the procurement. *See Elcon Enters., Inc. v. Wash. Metro. Area Transit Auth.*, 977 F.2d 1472, 1478 (D.C. Cir. 1992) ("Nor may courts set aside a procurement decision on the ground that the procuring agency potentially or actually violated applicable law in some trivial way—the violation must have been *clear and prejudicial*."). In other words, the losing bidders show no harm caused by HHSC's alleged failure to properly apply any statutory preference provision outlined above—the classic traceability inquiry.

These circumstances are readily distinguishable from *Wilson v. Community Health Choice Texas, Inc.*, where the MCO bidding on the procurement was the only entity qualifying for a mandatory contract award under section 533.004(a). 607

23

S.W.3d 843, 847-48 (Tex. App.—Austin 2020, pet. denied). Here, no MCO has argued that it was the only entity qualifying for any of the statutory preferences that Plaintiffs allege the Commissioner has failed to apply, as was the case in *Wilson*. *Id.* The trial court's holdings based on sections 533.003(a)(1) and 536.052(d), CR.5877, are not based on any finding of an incorrectly applied or deprived-of preference, and it had no grounds to enjoin the Commissioner under these provisions. Accordingly, Plaintiffs have no likelihood of success on their *ultra vires* claims that the Commissioner failed to properly implement a preference for one MCO over another.

**2.** Even if Plaintiffs could prove traceability, the various preferences cannot override the statutory objective to use a procurement method "that provides the best value to the agency"—an entirely discretionary endeavor within the Commissioner's sole prerogative. Tex. Gov't Code § 2155.144(c). Indeed, section 2155.144(n) explicitly provides that "[t]o the extent of any conflict, this section prevails over any other state law relating to the procurement of goods and services," with limited exceptions not applicable here. Thus, even if another provision limited discretion by specifying the manner of applying preferences—which none of them do—the agency must still follow a procurement method that provides the best value.

Only if two bidders offer the *same* value would these preferences even need to come into play. *See* 1 Tex. Admin. Code § 391.201(d) ("In case of *tie bids* or proposals which cannot be resolved by application of *one or more purchase preferences*, an award shall be made by drawing of lots, tossing a coin, or drawing of names with two witnesses present." (emphases added)). Otherwise, the preferences would conflict with

24

best value, in which case the best value standard controls. *See* Tex. Gov't Code § 2155.144(n).

As Ramirez testified and as the RFP plainly states, HHSC wanted respondents to provide information to "achieve the outcomes mandated in . . . Sections 533.002, 533.003(a)(1), 536.052, and 2155.144"—several of the very same statutory provisions challenged here. 6.RR.99-100; 9.RR.317. If the MCOs objected to how HHSC awarded preferences, they were obligated to raise objections during HHSC's reforms, in the pre-solicitation meetings, or with a pre-bid protest. *See* 1 Tex. Admin. Code § 391.305(a)(1) (requiring a protest to be filed "no later than the date that responses to a solicitation are due, if the protest concerns the solicitation"). Plaintiffs' failure to do so precludes them from challenging the procurement now.

Finally, the preference statutes are premised on receiving information from bidders so that HHSC can ascertain whether or how preferences apply. Plaintiffs point to no statute specifying that the agency is required to specifically ask for all information germane to preferences. It makes sense to put the onus on bidders, who have every incentive to make their best case for why the State should contract with them and who possess the most recent data concerning their business operations. And even if the RFP should have requested preference-related information, a protest concerning the solicitation must be filed "no later than the date that responses to a solicitation are due." *See* 1 Tex. Admin. Code § 391.305(a)(1). Plaintiffs' participation in the solicitation without protesting on those grounds not only fails to exhaust administrative remedies, but confirms that Plaintiffs are seeking retrospective relief, which cannot be awarded. *See infra* Part II.A.2.

**3.** Plaintiffs' counterarguments lack merit.

*First*, Superior argues HHSC did not "'give preference to organizations that have significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients' as required by Texas Government Code section 533.003." Superior.Mot.13; *see* Children's Plans.Mot.38. But section 533.003 provides neither a specific manner of awarding preference nor a specific degree of preference, leaving that to the agency's absolute discretion. *See Hous. Belt*, 487 S.W.3d at 163. Absolute discretion is particularly evident when considering other preferences and standards, including the prime directive to achieve best value as required by section 2155.144(c). Absolute discretion is also evident in allowing HHSC to ascertain "*significant* participation" in the provider network from "*each* health care provider *in the region* who has *traditionally* provided care to Medicaid and charity care patients." Tex. Gov't Code § 533.003(a)(1) (emphases added).

For instance, if the Commissioner determined that an organization has "significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients," *id.*, HHSC could prefer an organization by awarding the contract to that organization rather than another organization that is otherwise tied with respect to best-value criteria. When such a scenario does not come up in a specific procurement, however, the preference may not matter—but that doesn't mean the agency violated statute. It simply reflects HHSC's discretion in the manner and degree of giving preference. Certainly, no *ultra vires* action may lie for an MCO preferring

26

HHSC weigh this preference over all other statutory considerations. *See Klumb v. Hous. Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 10-11 (Tex. 2015) (holding that governmental bodies do not act without authority when "the breadth of [their] authority" under governing statutes "is inescapable").

Here, the Commissioner ensured significant provider participation under section 533.003 through the best-value criteria and through the technical questions. Specifically, BVC 1.c favored bidders who "[d]emonstrate[] engagement of Providers . . . in the Service Coordination Process," and BVC 2.b did the same for bidders who "promote access to Providers and Services, including addressing Provider shortages and barriers to care in specific areas of the State." 9.RR.317. BVC 3 rewarded those who "[e]ncourage[] Providers to participate in the Medicaid program." 9.RR.317. Technical questions 6 and 9 specifically ask the bidder to explain its "Provider Network adequacy including developing Services and Providers where they are needed," and to "[d]escribe the Respondent's approach to developing, contracting, and managing a robust qualified and culturally competent Provider Network." 9.RR.327, 329. Any suggestion that HHSC did not consider provider participation or solicit information allowing MCOs to explain their entitlement to preference under section 533.003(a)(1) is untrue.

*Second*, Superior argues HHSC did not "give preference to organizations that have successfully implemented quality initiatives or meet quality of care and cost-efficiency benchmarks as required by Texas Government Code section 536.052(d)." Superior.Mot.14-15; *see* Children's Plans.Mot.36-37. Like the preference in section 533.003, section 536.052 provides HHSC with absolute discretion.

Section 536.052(a) relates to quality initiatives and provides that HHSC "may allow" an MCO "increased flexibility to implement quality initiatives" in a managed-care plan. Tex. Gov't Code § 536.052(a). Section 536.052(b) relates to benchmarks and provides that HHSC "shall develop quality of care and cost-efficiency benchmarks." *Id.* § 536.052(b). Section 536.052(d) relates to preferences in awarding contracts and provides that HHSC "shall, in addition to considerations under Section 533.003 of this code and Section 62.155, Health and Safety Code, give preference" under one of two situations. First, HHSC can prefer an organization that "offers a managed care plan that successfully implements quality initiatives under Subsection (a) *as determined by the commission based on data or other evidence provided by the organization*." Tex. Gov't Code § 536.052(d). Second, HHSC can give a preference to an organization that "meets quality of care and cost-efficiency benchmarks under Subsection (b)." *Id.* There is no dispute that benchmarks were not developed in time to be used in this procurement. 6.RR.44.

In the absence of benchmarks, HHSC determined preference based on quality initiatives under section 536.052(a). 5.RR.224. As subsection (d) expressly provides, however, successful implementation of quality initiatives is "determined by the commission based on data or other evidence provided by the organization," which requires that the *organization* provide data or other evidence and then allows HHSC discretion to determine that a quality initiative was successfully implemented. Tex. Gov't Code § 536.052(d). A bidder that does not include such data or other evidence in its response has no room to complain that no preference was given, certainly when it chose not to protest the RFP.

Here, HHSC incorporated preferences for quality initiatives in the BVC and Technical Questions just like it did with section 533.003(a)(1). For instance, Technical Question 13 asked bidders to "[d]escribe the Respondent's Quality Improvement and performance evaluation strategies and initiatives specific to the STAR, CHIP, and HTW populations." 9.RR.330. Kay Molina's resolution of Cook Children's Bid Protest further demonstrates this, as HHSC relied on "data or other evidence provided by the organization," i.e., the bid, in lieu of benchmarks in determining preference. 9.RR.521.

*Third*, the Children's Plans argue that HHSC did not consider different plans for different populations, as required by section 533.003(a)(3), because "HHSC executives conceded that the procurement was conducted in a statewide manner." Children's Plans.Mot.39. But whether the procurement is conducted in a statewide or by-region manner has no bearing on whether the Commissioner "consider[ed] the need to use different [MCOs] to meet the needs of different populations." Tex. Gov't Code § 533.003(a)(3). Plaintiffs' assertion on this point is a non-sequitur. In any event, HHSC has obviously considered a diverse range of companies in this procurement, considered their preference as to which SA they prefer, and has noticed an intent to award contracts to different organizations in different SAs. 9.RR.322-23; *e.g.*, CR.3162, 3166, 3172, 3177, 3178 (technical weighted scores based on best-value criteria and technical-question responses), 3288 (final weighted scores after oral presentations).

*Fourth*, Superior argues the intended contracts "will violate Texas Government Code section 533.004, as amended in 2021, because the Executive Commissioner

29

proposes to award mandatory contracts without statutorily required considerations, including considerations regarding provider networks in the region under Texas Government Code section 533.003(a)(1), as required by Texas Government Code section 533.004(a)." Superior.Mot.17. Plaintiffs' argument here fails for the same reasons discussed above, explaining how the procurement is consistent with section 533.003(a)(1). Plaintiffs assert only that the agency did not *consider* section 533.003(a)(1), and it is unclear whether Plaintiffs would interpret these statutes together such that a preference under section 533.003(a)(1) must always override the mandatory nature of contracts under section 533.004.

Because HHSC considered the preference of section 533.003(a)(1), consistent with its discretion in giving such a preference, Plaintiffs cannot show that the Commissioner exceeded her legal authority in awarding mandatory contracts under section 533.004. In other words, there is no question the Commissioner has the *authority* to choose a winner—Plaintiffs' quibbling with the *weight* HHSC gave various factors provides no basis for overcoming the Commissioner's entitlement to sovereign immunity and dismissal of these suits. *See Young v. Tex. Parks & Wildlife Dep't*, No. 15-24-00052-CV, 2025 WL 1200947, at *7 (Tex. App.—15th Dist. Apr. 24, 2025, no pet. h.) ("[*U*]ltra vires claims 'depend on the scope of the state official's authority,' which we evaluate against the relevant statutory or other legal authorities, not a plaintiff's *ipse dixit*.") (quoting *Honors Acad., Inc. v. TEA*, 555 S.W.3d 54, 68 (Tex. 2018)).

*   *   *

Plaintiffs' recitation of facts regarding HHSC's application of statutory preferences is notable for what it omits. For instance, the Children's Plans cite Ramirez's testimony for the proposition that HHSC did not apply required statutory preferences. Children's Plans.Mot.9. But a closer review of the transcript shows that Plaintiffs' counsel did little more than read the statutes and solicit Ramirez's agreement that they generally apply. *See* 5.RR.97, 221-28, 230-33, 254-56. In the first place, Ramirez's legal conclusions are not evidence. In any event, the transcripts do not say that the procurement failed to award a specific MCO with statutory preference that the MCO showed itself entitled to. That is not evidence that HHSC failed to consider required preferences; it is at most evidence that the losing bidders failed to advocate for their supposed right to preferential treatment when they responded. The Commissioner does not act *ultra vires* by awarding contracts to MCOs who do, and losing bidders have no right to the extraordinary remedy of injunctive relief mandating a "redo." *See* CR.3279 (Plaintiffs' witness Jeri Somers opining that, "[t]he only remedy that can cure the impact of the premature disclosure is to cancel the Notice of Intent to award and to redo the entire process.").

Under Plaintiffs' theory, which is supported by no legal authority, the *ultra vires* doctrine requires HHSC to hold every RFP respondents' hand through the procurement process, advising them of every statutory preference to which they may be entitled. *See* Children's Plans.Mot.34. None of the governing statutes requires this absurd result, and imposing a requirement beyond what the statutes require is outside the province of the judiciary. *Tex. Highway Comm'n*, 234 S.W.2d at 860 ("Like private individuals and businesses, the Government enjoys the unrestricted power to

produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.") (quoting *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940)); *see also In re Tex. DFPS*, 696 S.W.3d 240, 243–44 (Tex. App.—San Antonio 2024, orig. proceeding) ("We have held that when the trial court orders the Department to enter into specific contracts to provide specific services to the children in the Department's care, it violates the Separation of Powers Clause of the Texas Constitution.").

HHSC and the beneficiaries of these services expect MCOs to be experts in both federal and state Medicaid laws, and the agency must award these contracts on a *competitive* basis. *E.g.*, Tex. Health & Safety Code § 62.055. If an MCO cannot figure out how to effectively advocate for itself under those provisions while bidding, perhaps it should not be serving the people of Texas. And under no credible legal theory can the Commissioner be said to have acted *ultra vires* by making that conclusion.

### c. Required disclosure of materials under PIA is not *ultra vires*.

The trial court also concluded that HHSC acted *ultra vires* because it disclosed Plaintiffs' redacted proposals in response to a PIA request, purportedly in violation of title 1, sections 391.101 and 391.209 of the Administrative Code. CR.5877. That perfunctory conclusion was erroneous.

While section 391.101 states the purpose of HHSC purchase rules generally, section 391.209 identifies the procedures governing requests for proposals. Critically, neither regulation contains any requirement that HHSC refuse to provide public information when HHSC receives a valid PIA request. To the contrary, Plaintiffs participated in the procurement with the full understanding that their proposals were

subject to public disclosure. *See* 9.RR.343-45 (citing Tex. Gov't Code ch. 552). PIA generally requires that public information, which is "information that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business . . . by a governmental body," be produced upon request by any member of the public unless the information is confidential by law or otherwise excepted from disclosure. Tex. Gov't Code §§ 552.002, .221, .301-.302.

Despite this, Plaintiffs appear to fault HHSC for disclosing redacted copies of proposals under the PIA as an "unlawful disclosure," because of title 34, section 20.208(d)(3) of the Administrative Code—a rule that did not form the basis for the trial court's order, CR.5877. Children's Plans.Mot.39-40. This rule from the Comptroller of Public Accounts governs state procurements utilizing the competitive sealed proposals procurement method and states: "A state agency may not disclose information derived from proposals or discussions with a respondent to any competing respondent prior to award or cancellation of the solicitation." 34 Tex. Admin. Code § 20.208(d)(3). But, even if this rule governed this procurement—which is unclear—a regulatory provision cannot trump PIA. *Cf. Jackson v. SOAH*, 351 S.W.3d 290, 298 (Tex. 2011) (holding that court rule of procedure governing confidentiality of documents must give way to PIA). Moreover, Plaintiffs cite no record evidence that HHSC "disclose[d] information *derived from* proposals or discussions with" any Plaintiff prior to an award. 34 Tex. Admin. Code § 20.208(d)(3) (emphasis added). That obligation is different in kind from HHSC's PIA obligations because it doesn't govern the proposals themselves and is irrelevant to the trial court's order. Bidders

33

agreed to a three-page procedure for PIA disclosures, 9.RR.343-45, and any expectation they had in secrecy succumbs to the mandate to provide information to any person requesting the bids under the PIA.

Moreover, as Kay Molina's resolution of Superior's bid protest shows, HHSC investigated and considered whether the disclosure of proposals under PIA had any effect on the solicitation and determined Superior, and others', assertions lacked any factual basis—nobody could show *how* their score could have changed. 9.RR.531. Plaintiffs' *ipse dixit* on this point, again, does not require a do-over of the multi-billion-dollar procurement.

### d. The trial court's order erroneously determined that the Commissioner violated the Texas due course provision.

The trial court also erred with its conclusory finding that the Commissioner violated the Texas Constitution's due course provision. CR.5878.[2] The order says the Commissioner's "continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates [due course of law] . . . by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391." *Id.* This language repeats verbatim Wellpoint's live petition, down to the mis-cited provision. CR.4273. Texas Children's Health Plan (TCHP) appears to be the only other Plaintiff making this argument. CR.4279. TCHP argues that it was entitled to certain PIA requests which were

---

[2] The order (and Wellpoint's live petition) cites the wrong due course provision governing excessive bail, Tex. Const. art. I, § 13. CR.4273, 5878. The due course provision that protects individual rights is section 19.

denied, thus preventing them from meeting the protest burden of proof and denying THCP the ability to timely file and obtain meaningful review. CR 4729. But TCHP and Wellpoint offered no evidence or argument as to how the lack of information prejudiced them in the bid protest. And the trial court made this finding despite no Plaintiff raising due course arguments in their prehearing brief. *See generally* CR.3124-48.

This finding should be overturned because Plaintiffs lack a cognizable liberty or property interest in being awarded a government contract. *Honors Acad.*, 555 S.W.3d at 68 (holding that charter schools have no vested property right in their charters under the due course provision); *see also Orion Constr. Corp. v. United States*, 125 Fed. Cl. 668, 677-78 (2016). And there is no "promise" cited in title 1, chapter 391 of the Administrative Code on which to base these claims. Even if Plaintiffs had some interest warranting due-course protection, their cursory arguments below provide no grounds to conclude they lacked an opportunity to be heard. *See Orion Constr.*, 125 Fed. Cl. at 678. In fact, their misguided litigation conduct resulting in the improper injunction foreclosed any meaningful agency appeal process. *Supra* Part.I. The trial court accordingly lacked any basis in law or fact to make this finding.

### e. The trial court justified the temporary injunction with statutory mandates that do not exist.

Beyond misconceiving the discretionary nature of the existing statutory requirements, the trial court also invented several of its own that HHSC purportedly violated.

*First*, the court found that "Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by . . . § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code §62.051(e)." CR.5877. But neither provision contains a supplementary investigation mandate beyond the procurement process the trial court acknowledges HHSC used. The statute does not specify the content or extent of evaluation, leaving this to the agency's discretion. The order's reliance on Health and Safety Code section 62.051(e) also defies reality—that provision applies only to "entit[ies] that enter[] into a contract" with HHSC, notwithstanding that the court could not simultaneously enjoin the Commissioner from contracting with the winning bidders while violating a review procedure that only applies to the parties to a final contract. *See* Tex. Health & Safety Code § 62.051(e); CR.5877.

At bottom, HHSC exercised absolute discretion to certify the bidders by evaluating their RFP responses and their responses to the certification questionnaire, 5.RR.275, to make the statutorily required certification. Plaintiffs cannot specify what the Commissioner should have done differently or identify any limit on the Commissioner's statutory discretion that she allegedly exceeded. Simply labeling HHSC's certification a "self-certification" because it considered the bidders' responses fails to show that the certification contemplated exceeded the Commissioner's authority.

Plaintiffs' assertion that HHSC did not independently evaluate bidders' certifications is also not accurate. The key testimony the Children's Plans invoke, for example, confirms that evaluators used a "four corners" approach, meaning that HHSC is not statutorily required to conduct *additional* investigation into the bidders. 5.RR.272-74. Nothing in the statute prohibits HHSC from certifying based on the bids and questionnaires.

*Second*, the statements of statutory purpose found in section 533.002 and sections 391.101 and 391.209 impose no duty on the Commissioner to do anything other than to "implement the Medicaid managed care program by contracting with managed care organizations in a manner that, *to the extent possible* . . . promote[s] continuity of care [and] . . . reduces administrative and other nonfinancial barriers for recipients in obtaining health care services." Tex. Gov't Code § 533.002(1)(B), (6) (emphasis added). The Commissioner has done precisely this through designing the managed care program as a whole, offering different product lines, and requiring contractual terms that address these factors. And section 533.002 provides wide discretionary safe harbor with the language "to the extent possible." *See id.* Plaintiffs' own exhibits below admitted that HHSC scrutinized continuity of care by "conduct[ing] a robust, year-long readiness review prior to the contract operational start date to ensure smooth implementation." CR.3152. Thus, these provisions form no valid grounds for enjoining the Commissioner from completing the procurement.

*Third*, Plaintiffs' assertion that CHIP and STAR services cannot be procured in the same RFP also lacks any basis in statute. CR.5878. The trial court concluded that

"Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155." CR.5878. Any reader would search in vain to locate such a prohibition in these statutes because this purported mandate was created of whole cloth. Rather, the text provides that the Commissioner "may give preference to a person who provides similar coverage under the Medicaid program." Tex. Health & Safety Code § 62.155(c)(1). If she were to recognize a CHIP MCO for satisfying statutory preferences accorded to Medicaid MCOs, she would be squarely within this statutory authority. *See id.*

In any event, HHSC's decision to procure the CHIP piece with the mandatory STAR piece is consistent with the best-value scoring to award the CHIP contracts competitively, and, more importantly, consistent with the Commissioner's obligation to "coordinate the child health plan program with the Medicaid program." Tex. Health & Safety Code §§ 62.051(a), .053(3); 9.RR.528-29. Further, HHSC considered continuity of care through this choice because it would provide "[t]he least disruption in the delivery of Covered Services to Members." 9.RR.528 (citing Tex. Health & Safety Code § 62.051(b); Tex. Gov't Code § 2155.144(d)(11)).

## 2. Plaintiffs' claims seek an impermissible retrospective remedy.

Plaintiffs lack a judicially enforceable right to compel the Commissioner to redo the procurement because nothing in statute authorizes such relief. And any such judicial remedy would be impermissibly retrospective, running afoul of sovereign immunity.

38

### a. The procurement statutes contain no "redo" remedy.

Even if the procurement statutes contain commands that weren't followed, the question is whether the Legislature has provided a specific consequence that must result from the agency's inability to satisfy those commands. *In re Stetson Renewables Holdings, LLC*, 658 S.W.3d 292, 297 (Tex. 2022) (orig. proceeding). It has not.

When several remedial actions *could* form the basis for an appropriate response, it is for the Legislature to make such policy choices—not for the courts to judicially impose the consequence on the agency. *Id.* As the Supreme Court explained, "[t]he mere existence of so many different potential consequences of the failure to abide by a statutory requirement—particularly given that the legislature can freely choose among them—should generate judicial caution." *Id.* at 296. "Such choices are the proper domain of the *legislature*." *Id.* at 297. But "[f]ashioning an extratextual judicial remedy against the executive branch . . . creates a serious risk that the courts will intrude into the prerogatives of *both* other branches." *Id.* And "the legislature's authority is at stake, too," because "it is primarily for the legislature to determine how far it is worth pressing to achieve compliance with its own statutory directives." *Id.*

In this case, no statute says that a procurement must be redone whenever statutory requirements are not met. The lack of a legislatively mandated judicial remedy is fatal to Plaintiffs' claims. *See Morath v. Kingsville ISD*, 710 S.W.3d 918, 925 (Tex. App.—15th Dist. 2025, no pet.). This Court recently applied the same principle in holding that even if the Texas Education Commissioner violated a statutory requirement by failing to issue school ratings by statutory deadlines for school years in which COVID-19 hobbled public school operations, cancelling those ratings altogether, as

the plaintiffs demanded, was not a necessary consequence flowing from shortfalls in the TEA Commissioner's statutory duties. *Id.* So too here. No statute Plaintiffs invoke mandates the unjustified and meritless disruption of the MCO procurement program they demand and have wrought on the State for several years.

To be sure, there are several potential remedies that the Legislature *could* have fashioned to address the Commissioner's purported violation of statutory requirements governing the procurement process: It could require HHSC to "either redo something, fix something, or sign the contracts." 5.RR.180. In 2020, for example, the procurement was redone; the Legislature could have mandated such a remedy. It also could have provided for additional rights to losing bidders as has been done at the federal level under the Tucker Act. *See* 28 U.S.C. § 1491(b)(1). Or, more to the point, it could have allowed disappointed bidders to sue the Commissioner for defects in the procurement process, as it did for political-subdivision procurements. Tex. Loc. Gov't Code §§ 252.061, 262.033. If anything, the Legislature's choice *not* to allow similar suits challenging *state* procurements indicates an intention to deny attempts at judicial intervention, as Plaintiffs seek here. *See Fireman's Fund Cnty. Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 769 (Tex. 2000) (per curiam) ("When the Legislature has employed a term in one section of a statute and excluded it in another, we presume that the Legislature had a reason for excluding it.").

The Legislature chose none of these options. And in the absence of such consequences in the statute, the Commissioner "enjoys the unrestricted power . . . to determine those with whom [she] will deal." *Tex. Highway Comm'n*, 234 S.W.2d at

860. This Court should not impose a judicially crafted one in the first instance. *See Stetson Renewables Holdings*, 658 S.W.3d at 297; *Kingsville ISD*, 710 S.W.3d at 925.

### b. Redoing the procurement is fundamentally retrospective.

Plaintiffs' claims are premised on their assertion that the Commissioner acted *ultra vires* by creating an "unlawful procurement *process*." *E.g.*, Superior.Mot.2 (emphasis added). To the extent Plaintiffs allege that the Commissioner has committed *ultra vires* acts by authorizing a solicitation that was illegal, they seek an impermissible form of retrospective relief barred under *ultra vires* principles. *Ultra vires* relief requires an ongoing violation of a plaintiff's rights. *Util. Assocs.*, 517 S.W.3d at 312-13. But when Plaintiffs agreed to the terms of the RFP by submitting their proposals, they waived any claim of an ongoing violation of their rights[3] not to be subjected to an unlawful process. 9.RR.303; *see Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action."). It was at that point the nature of any relief the Court could have granted became retrospective for purposes of *ultra vires* law. *See Util. Assocs.*, 517 S.W.3d at 309 ("The third limitation [of an *ultra vires*

---

[3] This point assumes a losing bidder has a "right" for the purposes of contesting the Commissioner's actions as *ultra vires*, but for the reasons argued *supra* Part II.A.2.a, Plaintiffs have no such right susceptible to judicial intervention in the first instance.

suit] relates to the nature and effect of the remedy sought. The remedy must be prospective in nature – i.e., compelling legal compliance going forward, as opposed to awarding retrospective relief to remedy past violations.").

In *Utility Associates*, the court declined to entertain an *ultra vires* suit that would "effectively [] undo a contract award previously approved by the Austin City Council, invalidate an already-executed contract between the City and Taser, reopen the previously concluded procurement process, and compel the City Defendants to re-award the contract to Utility instead." *Id.* at 312. Although there is not yet an executed contract, there is no question Plaintiffs seek to reopen the bid-evaluation process and start it over so they can get another bite at the apple. CR.3279. Thus, Plaintiffs' demand—at the insistence of their expert witness—that the Commissioner "redo the entire process" ignores their acquiescence in the terms of the RFP (until they found out they lost) and is entirely backward-looking. *Id.* In other words, even if the trial court were correct to find that the RFP should have but does not consider MCOs' past performances, for example, the agency's intent to award the contracts is not the type of "ongoing violation" it can simply cease prospectively as with a proper *ultra vires* claim. That the agency would have to go back to square one of the procurement process and change the RFP demonstrates that Plaintiffs seek prohibited retrospective relief.

HHSC's decisional process as to the RFP concluded when Wellpoint's pre-bid protest was overruled. 9.RR.547. Wellpoint agrees that it cannot "seek cancellation of any procurements," Wellpoint.Mot.15, but the rules established in the RFP, which require bidders to notify HHSC of defects in the RFP before bidding, *are* the

procurement. Wellpoint's decision to proceed with the procurement irrevocably waived any claim seeking to retrospectively create a new procurement. *See Util. Assocs.*, 517 S.W.3d at 312. And the same is certainly true for the other Plaintiffs, who filed no pre-bid protests at all. 9.RR.303.

## B. Equity favors the Commissioner.

In addition to showing a probable right to relief, Plaintiffs "must plead and prove" a "probable, imminent, and irreparable injury in the interim." *Loe*, 692 S.W.3d at 226. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The "principles, practice and procedure governing courts of equity shall govern proceedings in injunctions." *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979) (quoting Tex. R. Civ. P. 693).

Here, in addition to the Commissioner's likelihood of success on the merits, the "equitable balancing of th[e] harms" favors the Commissioner. *In re State*, 711 S.W.3d 641, 645 (Tex. 2024) (orig. proceeding). Along with the harm "that will befall either party," courts must consider "the harm that other parties or the public will suffer if relief is granted." *Id.* On balance, equity favors the Commissioner: Although the harm to the Commissioner (and thus, the State) is far more probable, imminent, and irreparable than the harm to Plaintiffs, allowing the temporary injunction to survive puts the healthcare of over four million low-income Texans at jeopardy. Equity does not tolerate this unjust result.

**1.**     Start with the harm to the Commissioner (and by extension, the State). As the "Supreme Court has repeatedly reaffirmed," the State has "an 'intrinsic right to . . . enforce its own laws.'" *City of San Marcos*, 714 S.W.3d at 245 (quoting *State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) (per curiam)). That bedrock principle animates with equal force where the State has a significant interest in seeing its procurement laws executed. In enacting statutes vesting expansive authority and discretion in the Commissioner, the Legislature directed that critical STAR and CHIP programs operate efficiently and effectively, *see* Tex. Gov't Code § 532.0051; Tex. Health & Safety Code §§ 62.051(a), .053(3), and that the regular procurement of services from MCOs occurs according to the Commissioner's plan, *see* Tex. Gov't Code § 536.052(b). No doubt, the Commissioner has an interest in fulfilling this statutory mandate, just as the State has an important interest in having the procurement process operate without interruption.

Additionally, as explained above, the Legislature granted the Commissioner absolute discretion in carrying out this statutory plan. And for good reason: Disruption to that plan seriously prejudices the State, which carefully designed the current plan to transition and protect continuity of care. As Plaintiffs acknowledge, "HHSC spent significant time and State resources" to complete this procurement; only after years of reform, cross-government collaboration (vertical and horizontal), and numerous pre-bid opportunities for collaboration with Plaintiffs themselves was the procurement accepted. Tex. Gov't Code § 533.002(1)(B), (6); Children's Plans.Mot.9, 24. The trial court caused a grave inequity by enjoining that process only *after* Plaintiffs learned they would not receive contracts.

44

One traditional purpose of a temporary injunction has been "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru*, 84 S.W.3d at 204. The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig. proceeding). As the Supreme Court recently explained, however, discussing "preservation of the status quo" "offer[s] little help to" courts because "debates about how to define the status quo can descend quickly into lawyerly wordplay." *In re State*, 711 S.W.3d at 644. To the extent preserving the status quo is relevant here, it too favors the Commissioner. There is no status quo to preserve here, because the last uncontested status is, at the latest, the moment before the NOIA STAR and CHIP contracts to MCOs other than Plaintiffs. But if that is the status quo Plaintiffs seek to preserve, then imagine the irreparable harm to the State: Returning to that status quo would require retrospective relief—either undoing the NOIA or undoing the entire procurement—and both violate sovereign immunity.

Since it went into effect, the injunction halted the entire procurement process. Not just limited to the Plaintiffs' specific, covered region, the injunction interferes with the entire statewide implementation of the STAR and CHIP programs. Plaintiffs nonetheless insist that their concern is for the 1.5 million patients who must change plans if the procurement is accepted. *See* Children's Plans.Mot.26; *see also* Wellpoint.Mot.19. But Plaintiffs miss the larger point beyond their own financial interest: These programs are implemented statewide and affect over four million low-income Texans; they involve billions of dollars and are not only a large percentage of HHSC's budget, but of the entire State budget. If the temporary injunction is not

45

vacated, much of what HHSC and the Commissioner have done to reprocure the contracts will be wasted—all so that Plaintiffs can place a thumb on the scale in their favor the next go-round.

**2.** Next, consider the harm to Plaintiffs. Whatever injuries Plaintiffs claim to have suffered are the ordinary results of participation in any competitive market. As a legal matter, Plaintiffs can prove no significant harm resulting from the procurement that is ripe, *supra* Part I, or irreparable.

In contrast to the significant harms the State is currently suffering—to its sovereignty and resources—there is no evidence that Plaintiffs have suffered harm. They cannot show that, but for the alleged deficiencies in the procurement, they would be exposed to an adverse outcome that they would not otherwise face. As explained above, Plaintiffs' problem is not with the process but with the result. Even if HHSC utilized a procurement process that Plaintiffs like, they would still remain aggrieved until they were awarded the service contracts.

And with Plaintiffs' current contracts set to naturally expire soon, Plaintiffs' litigation strategy is obvious: After losing a fair procurement-bidding process, the only way to prevent (or extend) the inevitable expiration of their contracts is to force HHSC to renew them. But the mutually agreed upon end of a contractual relationship *cannot* be a harm for purposes of injunctive relief. *See, e.g.*, *Turner v. Joshua ISD*, 583 S.W.2d 939, 942 (Tex. App.—Waco 1979, no pet.) (finding the appellant had no right to a renewed contract after his contract ended by its own terms). Plaintiffs never had a right to a new contract and have not shown that they would have received one but for an abuse of discretion by the Commissioner. Thus, Plaintiffs "lack a legally

46

cognizable interest" because "the court's action on the merits cannot affect [Plaintiffs'] rights or interests." *Heckman v. Williamson County*, 369 S.W.3d 137, 162 (Tex. 2012). Moreover, Texas law is also clear as to speculative, unmanifested harms: "fear and apprehension of injury are not sufficient to support a temporary injunction." *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 227 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Jordan v. Landry's Seafood Rest., Inc.*, 89 S.W.3d 737, 742 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)); *cf. also* Part I (ripeness).

Nor can Plaintiffs show how they "will suffer *irreparable* harm if relief is not granted." *In re State*, 711 S.W.3d at 645 (emphasis added). Plaintiffs allege harm to contractual rights, but that type of harm "can rarely establish an irreparable injury." *N. Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.). To be sure, HHSC's procurement does not disqualify Plaintiffs from participating in a later re-procurement. And the harm Plaintiffs allege could be repaired through the available administrative-appeal process. In contrast, the State is the one irreparably harmed when its ability to provide the most timely and effective care to low-income Texans is so definitively blocked.

One of the canonical equitable "principle[s] is that [e]quity aids the diligent and not those who slumber on their rights," *Rivercenter Assocs. v. Rivera*, 858 S.W.2d 366, 367 (Tex. 1993) (citation omitted), and Plaintiffs delayed asserting their rights here until it became apparent they were going to lose, not when any purported illegality on the Commissioner's part came to light. Plaintiffs' complaints all turn on the procurement process itself. But if they were dissatisfied with that process, Plaintiffs had the option to protest the terms of the RFP. Instead, Plaintiffs slumbered, waiting to

47

see how the procurement would turn out. Far from diligent, this Court should not award Plaintiffs' last-ditch effort to re-do the gamble they voluntarily pursued.

Moreover, the consequences underpinning Plaintiffs' position would be intolerable. If Plaintiffs succeed, this Court would greenlight any losing bidder to halt important government functions whenever they are dissatisfied with the outcome. A conclusory allegation of harm to revenue (like the one here), without more, would be legally sufficient to enjoin the State from moving forward with its business every time a contractor loses a bid. *See Elcon Enters.*, 977 F.2d at 1479 (opining that courts cannot become "the forum for all manner of objections to procurement decisions") (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1302 (D.C. Cir. 1971)). Equity does not favor such a result—especially where, as here, the state actor has exercised broad, statutorily conferred authority to determine what furthers the public interest. Adopting Plaintiffs' reasoning would not only open the floodgates, but it would also divert the State's precious resources away from the execution of normal State business to paying the costs of court disputes with losing bidders. *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 737 (Tex. 2020). Make no mistake, Plaintiffs' position threatens the very structure of state government itself.

**3.** Finally, the Court must weigh the harm to the over four million Texans who rely on HHSC's timely and efficient procurement of Medicaid and CHIP funds. How "other parties or the public will suffer" is especially important here—where Plaintiffs' disruption has created uncertainty for over four million Texans. The public interest in the efficient statewide provision of Medicaid services vastly outweighs the MCOs' corporate interests.

48

"[W]here the State is the appealing party, as it is here, its interest and harm merge with the public." *Vote.Org v. Callanen*, 39 F.4th 297, 309 (5th Cir. 2022) (citation modified). Ironically, despite that basic principle, Plaintiffs incorrectly believe they are the ones vindicating the public interest—specifically, arguing that, because they were not selected to provide care, "HHSC's procurement of Medicaid and CHIP managed care contracts will negatively impact more than 1.5 million" care recipients. Superior.Mot.9; *see also* Children's Plans.Mot.26 ("[T]he Children's Plans [are] qualitatively different from other MCOs."); Wellpoint.Mot.19 ("[B]eneficiaries will also lose any meaningful choice of MCOs when the Commissioner replaces proven high-performing vendors like Wellpoint with unqualified or underqualified MCOs.").

But the broad discretion to determine which contracts for which MCO best serve the public interest is vested solely in HHSC. Tex. Gov't Code § 2155.144(c); *see supra* Part II.B.1. Only HHSC can determine which contracts provide the State with the most efficient and effective services. HHSC made that decision, which is embodied in the NOIA. A judicial determination to the contrary would violate the separation of powers by "interfering with the policymaking responsibilities of other branches of government and seeking to control their choices regarding the use of public funds." *Nettles*, 606 S.W.3d at 739. After thoughtful scrutiny, HHSC has determined Plaintiffs' contracts are less preferable than the winning bidders', so the public interest weighs against granting Plaintiffs contracts and in favor of allowing HHSC to proceed.

Plaintiffs also argue that "forcing Medicaid beneficiaries to change providers has negative consequences." Children's Plans.Mot.23; *see also* Superior.Mot.26-27; Wellpoint.Mot.19. But this procurement is not about the providers; it is about the middleman *plans*. Obviously, beneficiaries must change plans any time the winner of an earlier procurement loses a later one. And beneficiaries could choose to switch plans any time during the term of the contract. Once again, contractors cannot use incumbency as a shield against competition. Were it otherwise, any incumbent contractor could disrupt important government functions whenever it loses a bid.

Besides, as the Commissioner testified, changing plans here is not a harm when necessary to provide beneficiaries the health care they need. 6.RR.142-43. There can be no categorical, inflexible presumption that changing the plan for any reason will always fail to be in the best interests of the beneficiary. After all, beneficiaries will move to the plans that HHSC has determined are superior: The question of who gets to decide what plans serve beneficiaries best cannot be made by the MCOs for themselves. That question must be resolved through the procurement process HHSC and many others in the State government spent years implementing.

Finally, Plaintiffs argue that the temporary injunction will preserve the status quo. What they fail to mention is that their ideal status quo contradicts Texas public policy. The status quo cannot be, as Plaintiffs envision, a limbo between the procurement and the execution of new contracts, which Plaintiffs then argue necessitates extensions to their contracts pending appeal because of the natural expiration of the old contracts. The General Appropriations Act for the 2024-25 Biennium forecloses that possibility. Act of May 29, 2023, 88th Leg., R.S., ch. 1170, §1, art. IX, sec.

17.09(e), 2023 Tex. Gen. Laws 3573, 4511. It states that "[i]t is the intent of the Legislature that agencies and institutions minimize the use of extensions that extend a contract beyond the base term and any optional extensions provided in a contract." *Id.* When the Legislature declares that Plaintiffs' proposed status quo is against the public interest, and HHSC has used its legislatively vested discretion to determine which contracts best serve the public interest, the equities undoubtedly must weigh against a temporary injunction.

\* \* \*

Equity weighs decisively in the Commissioner's favor. None of the harms Plaintiffs allege are imminent, probable, or irreparable. On the other hand, allowing the temporary injunction to remain in effect will continue to jeopardize the public interest, which the State is charged with protecting. On balance, the State's interest in carrying out its statutory mandate, plus the public's interest in enjoying the fruits of an equitable, fair, and statutorily compliant procurement process outweigh Plaintiffs' unripe interest in controlling who the State contracts with. To the extent any status quo considerations are useful, they counsel in favor of the Commissioner.

## C. The temporary injunction fails to comply with the mandatory requirements of Rule 683.

Should the Court find it has subject-matter jurisdiction, it should nevertheless reverse the trial court's injunction order because it violates Texas Rule of Civil Procedure 683. To confirm that Plaintiffs satisfied the elements of a valid temporary injunction, Rule 683 mandates that "[e]very order granting an injunction . . . shall set forth the reasons for its issuance." Tex. R. Civ. P. 683. The Rule's requirements

51

"are mandatory and must be strictly followed." *In re Luther*, 620 S.W.3d 715, 722 (Tex. 2021) (orig. proceeding) (per curiam) (quoting *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986)). And the trial court's reasoning for the injunction "must be specific and legally sufficient, and not mere conclusory statements." *Indep. Capital Mgmt., L.L.C. v. Collins*, 261 S.W.3d 792, 795 (Tex. App.—Dallas 2008, no pet.). Issuing a temporary injunction that does not strictly comply with Rule 683's requirements is an abuse of a trial court's discretion. *Id.*

Here, the trial court's injunction order should be reversed because it lacks any nonconclusory reason for issuing. *See* CR.5875-84. It states that "Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas." CR.5877. At least sixteen provisions are included within conclusory sentences merely stating that they are violated—without any explanation, underlying findings, or interpretation of the provisions at issue. *See* CR.5877-78.

The Commissioner's plea to the jurisdiction and response to the temporary injunction request, CR.2949-93, explains how the discretion given to the agency under each of these provisions defeats Plaintiffs' *ultra vires* claims, and how Plaintiffs seek retrospective relief from the trial court without first seeking administrative remedies available to them. The trial court's order fails to explain how the court could possibly have reached its conclusion that Defendant violated the cited statutes and regulations given the discretion afforded the Commissioner. Rather, the order merely provides a conclusory statement that the relief sought is prospective because contracts

have not been signed yet. CR.5876. In the face of the Commissioner's explanations and interpretations of the relevant statutes, and for all the reasons explained in Part II.A, *supra*, the order's bare recitals of statutory violations does not adequately set forth the reasons for issuing the temporary injunction.

Nor does the order address the Commissioner's evidence or arguments concerning Plaintiffs' lack of irreparable harm. *See* CR.2988-91. Instead, the order simply parrots Plaintiffs' arguments about the economic consequences of losing the contracts. Thus, the trial court abused its discretion by issuing a temporary injunction order that does not comply with the requirements of Rule 683, and it should be reversed as void. *See Luther*, 620 S.W.3d at 722.

## D. The trial court erred by excluding evidence demonstrating HHSC's scoring methodology.

The Court should also vacate the temporary injunction because the trial court prejudicially erred by excluding various exhibits offered by the Commissioner through Ramirez, who is Deputy Executive Commissioner for MCS Contract Management and Procurement Strategy, and was formerly the Director of major procurements for Medicaid and CHIP. *See* 6.RR.202; 7.RR.21-25 (transcribing trial court's exclusion of the Commissioner's exhibits). Nothing in the evidentiary rules supports that highly probative evidence's exclusion. The trial court's error was reversible because the evidentiary exclusions were incorrect, and the exclusion of the exhibits is likely to result in an improper judgment. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009).

### 1.  The consensus scoring rubrics are admissible and probative.

The exhibits are probative to show that the Commissioner acted within her statutory authority in awarding the contracts. After a lengthy procurement process that followed every applicable statutory guideline, HHSC's bid evaluators compiled scorings rubrics, which described, among other things, what factors HHSC considered in evaluating each bid. Plaintiffs seek to hide the truth this evidence proves: What better way to prove that HHSC did not comply with statutory guidelines than excluding evidence showing the exact factors HHSC considered in its evaluation process. Alas, despite its highly probative nature, the trial court excluded that outcome-determinative evidence based on objections of (1) hearsay and (2) lack of foundation. 7.RR.21-25. Each ruling is incorrect.

For starters, the evidence is not hearsay—it is a business record, admissible under Texas Rule of Evidence 803(6). As explained below, that is precisely how HHSC offered the evidence, and it squarely fits within the Rule's expansive understanding of a business record: The scoring rubrics are "[a] record of an act [or] event" "made at or near the time by" HHSC evaluators as "a regular practice" "in the course of a regularly conducted business activity," and nothing Plaintiffs might argue could "indicate a lack of trustworthiness" in its preparation. Tex. R. Evid. 803(6)(A)-(C), (E). At issue is whether "all these conditions [were] shown" through Ramirez's hearing testimony—in compliance with Rule 902(10). *See id.* R. 803(6)(D). In other words, that leads this Court to the second question—whether the requisite foundation was laid to offer the proof through Ramirez.

HHSC met its burden by laying the necessary foundation through Ramirez to admit the scorings rubrics as evidence. As explained above, Rule 803(6) requires "the custodian or another qualified witness"—here, Ramirez—to offer testimony that authenticates the evidence as compliant with Rule 902(10). Generally, Rule 902 outlines how certain evidence can self-authenticate. For business records, Rule 902(10) requires the proponent to submit a declaration showing, among other things not at issue, that the witness is familiar with the manner in which the record is created and maintained. *Id.* R. 902(10)(B) ("I am the custodian of records [or I am an employee or owner] of _____ and am familiar with the manner in which its records are created and maintained by virtue of my duties and responsibilities."). HHSC made that showing through Ramirez's testimony.

Ramirez's testimony showed his familiarity with the creation and maintenance of the scoring rubrics. *See* 20.RR.345-46 (testifying about "what the consensus scoring rubric looks like for each bidder . . . with the information included in it from the scribe during the consensus scoring meetings"). Indeed, Ramirez's familiarity with the procurement process manifests itself in several pages in the reporter's record—where he meticulously outlines every detail relevant to what HHSC evaluators consider at the procurement meeting. *See* 20.RR.343-46. The relevant and probative nature of the consensus scoring rubrics was further shown through the testimony of HHSC officials Emily Zalkovsky and Kay Molina. 20.RR.307, 313, 314, 320, 323.

But an even more basic reason supports the evidence's admissibility: HHSC complied with all that Rule 902(10) required. To admit self-authenticating evidence,

radical familiarity with the scoring rubric's substance was not required: "substantial[] compli[ance] with the language of Rule 902(10)(b)" is all HHSC needed to show. *McElroy v. Unifund CCR Partners*, No. 14-07-00661-CV, 2008 WL 4355276, at *3 (Tex. App.—Houston [14th Dist.] Aug. 26, 2008, no pet.). The Commissioner here exceeded the obligation to substantially comply with the Rule because Ramirez has in-depth knowledge of the scoring rubrics' creation, evaluation, and approval process, as his testimony proves.

Sound policy supports why strict compliance with Rule 902(10) is not required. Consider just one practical consequence: Were strict compliance required, HHSC, to admit the scoring rubrics as evidence, would have to accept mission impossible and find every evaluator that participated in the procurement process for each separate question. For even the government, that is an unfair ask. As HHSC argued at the hearing when the trial court sustained opposing counsel's evidentiary objection, "[i]t would be a very significant undertaking" to get each "evaluator[] who participated" in the scoring meetings to testify, as there were "a vast number of people" on "different teams for different questions." 7.RR.21-25. Why mandate such a wasteful undertaking when a simpler option is available, documented extensively, and permitted under the Rules? Ramirez authenticated the scorings rubrics, and the trial court erred in ruling otherwise.

### 2. The exclusion is almost certain to result in an improper judgment.

The court's error was harmful because it abused its discretion in excluding this evidence. *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 144-45 (Tex. 2016). The Supreme

Court has observed that an evidentiary error's correction does not require the proponent to show "that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *State v. Cent. Expressway Sign. Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (quoting *McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992)). The Court need only find that the rendition of an improper judgment was probable. *Id.* A successful challenge to an evidentiary ruling usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *See, e.g.*, *GT & MC, Inc. v. Tex. City Ref., Inc.*, 822 S.W.2d 252, 257 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Atl. Mut. Ins. Co. v. Middleman*, 661 S.W.2d 182, 185 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.).

The Commissioner's offer of proof, 8.RR.225-227, 20.RR.305-353, put the court on notice of the exhibits' evidentiary value to the case, but the court offered no reasoned explanation for their exclusion. *See Caffe Ribs* 487 S.W.3d at 144-45 ( "A trial court abuses its discretion when it acts without regard for any guiding rules.") (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)). It is difficult to conceive of how the case could *not* turn on evidence of how the bidders' proposals were scored, which is crucial to deciding the question of whether the procurement process complied with applicable statutes. Accordingly, the trial court abused its discretion by omitting legal grounds in its explanation, 7.RR.21-25, and refusing to consider evidence without which it would have insufficient basis to resolve the *ultra vires* question.

## PRAYER

The Court should reverse and render judgment dismissing Plaintiffs' claims with prejudice. Alternatively, the Court should reverse the order temporarily enjoining the Commissioner from completing the procurement process.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General

/s/ Cory A. Scanlon
CORY A. SCANLON
Assistant Solicitor General
State Bar No. 24104599
Cory.Scanlon@oag.texas.gov

JEFFREY A. STEPHENS
Assistant Solicitor General

MOHMED I. PATEL
Assistant Attorney General

Counsel for Appellant Cecile Erwin Young

## CERTIFICATE OF COMPLIANCE

Microsoft Word reports that this brief contains 14,918 words, excluding exempted text.

/s/ Cory A. Scanlon
CORY A. SCANLON

# In the Court of Appeals
# For the Fifteenth Judicial District

CECILE ERWIN YOUNG, IN HER OFFICIAL CAPACITY AS THE
EXECUTIVE COMMISSIONER OF THE TEXAS HEALTH AND HUMAN
SERVICES COMMISSION; MOLINA HEALTHCARE OF TEXAS, INC.;
AND AETNA BETTER HEALTH OF TEXAS, INC.,

*Appellants*,

*v.*

COOK CHILDREN'S HEALTH PLAN, TEXAS CHILDREN'S HEALTH
PLAN, SUPERIOR HEALTH PLAN, INC., AND
WELLPOINT INSURANCE COMPANY,

*Appellees.*

On Appeal from the
353rd Judicial District Court, Travis County

## APPENDIX TO THE BRIEF FOR APPELLANT
## CECILE ERWIN YOUNG

|  | Tab |
|---|---|
| Trial Court Order | 1 |
| Authorities | 2 |

**TAB 1: TRIAL COURT ORDER**

CAUSE NO. D-1-GN-24-003839

| | | |
|---|---|---|
| COOK CHILDREN'S HEALTH PLAN; TEXAS CHILDREN'S HEALTH PLAN; SUPERIOR HEALTHPLAN, INC.; and WELLPOINT INSURANCE COMPANY, | § § § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § § | TRAVIS COUNTY, TEXAS |
| CECILE ERWIN YOUNG, in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission, | § § § § § § | |
| Defendant. | § § | 353rd JUDICIAL DISTRICT |

## TEMPORARY INJUNCTION AND ORDER DENYING DEFENDANT'S PLEA TO THE JURISDICTION

Before the Court are the Applications for Temporary Injunction (the "Applications") filed by Plaintiffs Cook Children's Health Plan ("Cook Children's"), Texas Children's Health Plan ("TCHP"), Superior HealthPlan, Inc. ("Superior"), and Wellpoint Insurance Company ("Wellpoint," and collectively, "Plaintiffs"); and the Plea to the Jurisdiction (the "Plea") filed by Defendant Cecile Erwin Young ("Defendant"), in her official capacity as Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). After considering Plaintiffs' Applications and Defendant's response; Defendant's Plea and Plaintiffs' responses; the pleadings and attached evidence in these consolidated cases (Nos. D-1-GN-24-003839, D-1-GN-24-003874, D-1-GN-004059, and D-1-GN-24-004327); the parties' prehearing briefing; the evidence admitted in the record and adduced at the hearing held on September 30, October 1, October 2, and October 4, 2024; applicable authorities; the arguments of counsel, and all other matters properly before the Court, the Court DENIES Defendant's Plea and GRANTS Plaintiffs' Applications.

Page 1 of 10

The Court makes the following findings:

1. The Court has subject-matter jurisdiction over the claims in these consolidated cases because Plaintiffs have alleged and offered evidence demonstrating that Defendant will act *ultra vires* in awarding, executing, and implementing the contracts arising out of Request for Proposals No. HHS0011152 (the "RFP" or "STAR & CHIP RFP") because she has acted *ultra vires* in administering the RFP. Plaintiffs properly seek only prospective relief—specifically, injunctive relief prohibiting Defendant from awarding, executing, or otherwise implementing the intended RFP contracts and thus preventing further unlawful acts in connection with Defendant's procurement or contracting processes, as well as accompanying declaratory relief. Accordingly, sovereign immunity does not bar Plaintiffs' claims or deprive the Court of subject-matter jurisdiction.

2. The Court has personal jurisdiction over the parties in these consolidated cases.

3. Venue is proper in this Court.

4. Through the RFP, Defendant sought to procure managed care services for the State of Texas Access Reform ("STAR") Medicaid program and the Children's Health Insurance Program ("CHIP," and together with STAR, "STAR & CHIP").

5. Plaintiffs allege that Defendant administered the RFP in a manner that violates Texas law and that, consequently, any award, execution, or implementation of the intended STAR & CHIP managed care contracts that Defendant announced on March 7, 2024, will constitute *ultra vires* acts.

6. Plaintiffs have established a cause of action against Defendant and a probable right to the relief sought on their claims that Defendant has violated and, unless enjoined, will continue to violate statutory and regulatory requirements applicable to the RFP.

7. Specifically, Plaintiffs have established that Defendant has violated and will continue to violate the Texas Government Code, Texas Health and Safety Code, and Texas Administrative Code in procuring managed care contracts for STAR & CHIP in Texas, and that any award, execution, or implementation of Defendant's intended contract awards would be unlawful, because:

- Defendant's intended contract awards will fail to give preference to managed care organizations ("MCOs") that have significant participation in their provider networks from each healthcare provider in the region who has traditionally provided care to Medicaid and charity care patients as required by Texas Government Code § 533.003(a)(1);

- Defendant's intended contract awards will fail to give preference to MCOs that have successfully implemented quality initiatives as required by Texas Government Code § 536.052(a) and (d);

- Defendant has failed to develop and implement the cost-efficiency and quality of care benchmarks mandated by Texas Government Code § 536.052(b) despite being subject to an obligation to do so for over a decade. Defendant's intended contract awards will likewise fail to give preference to MCOs that have met such benchmarks as required by Texas Government Code § 536.052(d);

- Defendant's intended contract awards will fail to consider MCOs' past performances as required by Texas Government Code § 2155.144;

- Defendant's intended contract awards will fail to evaluate and certify that MCOs are reasonably able to fulfill the terms of the STAR contract as required by Texas Government Code § 533.0035 and to review MCOs to confirm their ability to fulfill the requirements of the CHIP contract as required by Texas Health & Safety Code § 62.051(e);

- In August 2023 and again in October 2023, Defendant wrongfully disclosed the RFP proposals of Plaintiffs and other respondents—with the August disclosure recipients including legal counsel for Aetna, one of the competing respondents, while the procurement was ongoing and prior to completion of the oral presentations—thus, destroying any integrity of the procurement process and creating an unlevel playing field that cannot ensure fair consideration of all proposals and is far from consistent, uniform, and transparent as required by 1 Texas Administrative Code §§ 391.101 and 391.209;

- Defendant's intended contract awards will fail to implement the Medicaid managed care program in a manner that improves the health of Texans by promoting

continuity of care and provides a medical home for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to reduce administrative and other nonfinancial barriers for recipients as required by Texas Government Code § 533.002;

- Defendant's intended contract awards will fail to consider the need to use different managed care plans to meet the needs of different populations as required by Texas Government Code § 533.003(a)(3);

- Defendant's intended contract awards will unlawfully award mandatory CHIP contracts to MCOs to which Defendant intends to award mandatory STAR contracts in violation of Texas Health and Safety Code §§ 62.055 and 62.155;

- Defendant's intended award of mandatory CHIP contracts will fail to give consideration to statutorily required factors, including those under Texas Government Code § 533.003, in violation of Texas Government Code § 533.004(a);

- Defendant's continuing practice of denying relevant information about a procurement to bidders until after the deadline to submit a bid protest violates the Due Course of Law provision of Article I, Section 13 of the Texas Constitution by not providing a meaningful bid protest process after promising one in 1 Texas Administrative Code Chapter 391; and

- Defendant's continuing practice of refusing to consider as untimely any information submitted in supplemental protests and/or after the protest filing deadline is inconsistent with the procedural protections promised to protestants in bid protest rules that require consideration of a protest or appeal submitted after the filing deadline when good cause for delay is shown under 1 Texas Administrative Code § 391.307(d)(1).

8. These statutory and regulatory violations, each singly and together collectively, have resulted in intended contract awards that will be invalid and unlawful, and the further execution and implementation of such intended contract awards will be *ultra vires* acts.

9. Furthermore, Defendant is currently evaluating bids for STAR Kids, a separate Texas Medicaid managed care program, through Request for Proposals No. HHS0013071 (the STAR Kids RFP"). The procurement processes in the STAR & CHIP RFP and the STAR Kids RFP are substantively identical. Plaintiffs have demonstrated that Defendant has no intention of

voluntarily correcting her course of action for future procurements, including altering the processes and procedures used in administering the STAR Kids RFP. The resulting STAR Kids contract awards will therefore also violate statutory and regulatory requirements and be *ultra vires*.

10. Plaintiffs have established a probable right to relief and that Defendant's award, execution, and implementation of the intended, unlawfully procured STAR & CHIP contracts will, if not enjoined, cause Plaintiffs to suffer imminent and irreparable injury.

11. Cook Children's has established that execution and implementation of the contracts would result in irreparable harm to Cook Children's because:

- The loss of STAR & CHIP contracts threatens Cook Children's financial viability and might lead to the forced wind-down of the entity;

- Cook Children's participation in the STAR Kids program is in jeopardy because the larger STAR & CHIP contracts provide economies of scale to limit losses from STAR Kids;

- Cook Children's 100,000-plus STAR & CHIP members will be forced to change to different health plans from different companies, risking disruption to the members' healthcare and their access to their current primary care providers, specialty care providers, or both;

- Cook Children's has suffered immediate operational disruptions, including hiring difficulties and the delay of needed internal projects;

- Cook Children's can no longer negotiate a new pharmacy benefits contract alongside other Texas-only Medicaid plans and consequently will need to pay more for pharmaceuticals;

- Cook Children's 375 employees are at risk of losing their jobs—both the 70% of employees who focus on STAR & CHIP and the 30% who focus on STAR Kids; and

- New STAR & CHIP entrants in the Tarrant Service Area will likely poach Cook Children's experienced employees before the new contracts go into effect—thus threatening Cook Children's STAR & CHIP operations while it is still required to provide services under its current contracts.

12. TCHP has established that execution and implementation of the contracts would result in irreparable harm to TCHP because:

- TCHP's 425,000 STAR & CHIP members will be forced to change their health plans, impacting their access to care;

- TCHP has suffered and will continue to suffer disruptions in workforce— threatening the future viability of the health plan—as employees voice concern about job security in light of the intended contract awards;

- TCHP's 650 employees are at risk of losing their jobs, impacting the financial health of its entire Texas Children's Health Care System beyond that of the health plan;

- TCHP has already suffered and will continue to suffer the poaching of its well-trained employees by other MCOs—further endangering its operations while it remains under contract with HHSC;

- TCHP will lose members and providers, further threatening the viability of the health plan and confusing members and providers;

- TCHP has and will suffer damage to its reputation and goodwill; and

- TCHP's participation in the STAR Kids program is at risk because the larger STAR & CHIP contracts are needed to provide economies of scale to limit losses from STAR Kids. If TCHP loses its STAR Kids contract, its 26,000 STAR Kids members would need to change their health plans, thereby adversely impacting those members' access to care, adversely impacting TCHP's workforce, adversely impacting TCHP's ability to operate and damaging TCHP's reputation and goodwill.

13. Superior has established that execution and implementation of the contracts would result in irreparable harm to Superior because:

- Superior will experience a reduction in the number of STAR & CHIP members it serves today, forcing members to change plans even before the operational start date of the new contracts;

- Superior will need to begin reducing its workforce just as new MCO entrants and MCOs expanding their membership will seek to poach Superior's employees, who are already grappling with the uncertainty of their jobs in light of the intended awards;

- Providers will be less likely to contract with Superior as contract renewals are being negotiated over the next few months and Superior's leverage in provider contract negotiations will be substantially diminished;

Superior has made substantial investments in partnerships that promote HHSC's value-based care priorities. These partnerships involve risk-sharing agreements



Page 5880

between Superior and the partner entities and have been built to scale over time. Superior will lose the benefit of its initial investments in these partnerships; and

- Superior's ability to provide the same level of service currently provided under existing STAR & CHIP contracts through the August 31, 2025, expiration date will be diminished due to workforce challenges that would be caused by execution of the STAR & CHIP contracts, which will impact Superior's operations and cause it to suffer reputational damage.

14. Wellpoint has established that execution and implementation of the contracts would result in irreparable harm to Wellpoint because:

- Almost 380,000 current Wellpoint members will be forced to change their health plan, thus losing access to their existing Wellpoint provider network;

- Wellpoint will be forced to consider substantial reductions in and/or relocations of its existing 1,200-plus-person workforce dedicated to the Texas Medicaid programs;

- Wellpoint has already suffered and will continue to suffer the poaching of its highly trained employees by other MCOs. During the review and transition period, which HHSC has stated will take at least a full year, Wellpoint must continue to provide uninterrupted healthcare to its members, and its ability to do so will be substantially jeopardized if there are key staff vacancies;

- Wellpoint has already suffered and will continue to suffer difficulty retaining its existing, robust provider network in the impacted service areas. Maintaining its network of healthcare providers is critical to Wellpoint's commitment to providing high-quality, cost-efficient healthcare for the entire duration of its existing contracts. Worse yet, Wellpoint has learned that some providers are informing members that Wellpoint will no longer be providing STAR & CHIP services in impacted areas and are encouraging them to switch plans on the basis of Defendant's intended contract awards;

- Wellpoint has made significant investments in service areas that it will be forced to exit and has longstanding provider partnerships with alternative payment models that were developed and built to scale over multiple years. Wellpoint will lose the benefit of its investments in those service areas and partnerships.

- There is no legal remedy that can fully compensate Wellpoint for (1) the loss of its members, (2) the harm to its business resulting from the intended, unlawfully procured contract awards, and (3) the harm to its ability to compete in a fair and lawful procurement process in future procurements; and

The harm to Wellpoint is imminent because Defendant did not follow the requirements of Texas law in procuring the STAR & CHIP contracts but



nevertheless intends to execute and begin implementing the intended, unlawfully procured contract awards. In addition, the harm to Wellpoint is imminent as Defendant does not intend to correct her unlawful course of action for future procurements or the ongoing STAR Kids RFP.

15. Plaintiffs have also presented evidence that they will begin losing STAR & CHIP members now, even though operations under the intended STAR & CHIP contract awards are not scheduled to start until September 1, 2025. Providers are already informing Plaintiffs' members that Plaintiffs will no longer be providing STAR & CHIP services in certain service areas of the state and are encouraging members to switch plans. The confusion among providers and members alike will only worsen if the intended contract awards are executed notwithstanding the pending challenge to their legality.

16. Money damages are not adequate compensation because the harms Plaintiffs will suffer cannot be measured by any certain pecuniary standard. Furthermore, Plaintiffs cannot be adequately compensated in damages because Defendant is immune from suit for damages and any limited waiver of immunity is insufficient to compensate for Plaintiffs' harms.

17. The harms to Plaintiffs outweigh any potential harms to Defendant or HHSC that would result from preserving the status quo during the pendency of these consolidated cases. Neither Defendant nor HHSC would be harmed if the execution and further implementation of the intended STAR & CHIP contracts are delayed given that (1) operations under the intended contract awards are not scheduled to start until September 1, 2025, and (2) HHSC has previously delayed the RFP several times and was able to continue providing coverage through the current STAR & CHIP contracts by extending the contracts in effect at the time.

18. The public will not suffer harm if a temporary injunction is granted but will suffer harm if Defendant executes and implements the intended, unlawfully procured contract awards. The intended contract awards will impose significant harm and confusion on millions of Texas's

STAR & CHIP members. More than 1.5 million Texans, mostly children—and 43% of the total STAR & CHIP population—will be forced to change health plans. This in turn would cause significant harms to those beneficiaries, for which there is no adequate remedy at law available against Defendant, including:

- Confusion among those beneficiaries due to difficulties in informing them of the change in available health plans;

- Disruption to those beneficiaries' access to care and continuity of care, thereby threatening the medical care and the very health and welfare of those beneficiaries; and

- Administrative burdens of finding new health plans and potentially new healthcare providers.

19. The injunctive relief Plaintiffs request is narrow in scope and tailored to prohibit Defendant from continuing to act *ultra vires*. The balance of equities and public interest weigh in favor of granting Plaintiffs' requested injunctive relief.

Accordingly, it is therefore ORDERED that Defendant's Plea to the Jurisdiction is DENIED.

It is further ORDERED that Plaintiffs' Applications for Temporary Injunction are GRANTED. The Court ORDERS that:

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from awarding, signing, entering into, executing, implementing, or otherwise taking action to effectuate or perform any contracts resulting from or in connection with the STAR & CHIP RFP or to further the procurement or contracting processes for the STAR & CHIP RFP; and

- Defendant, and all other persons or entities in active concert or participation with Defendant, shall refrain from further proceeding with the procurement of, issuing a notice of intent to award or awarding contracts under, or otherwise implementing results from the STAR Kids RFP.



IT IS FURTHER ORDERED that Defendant shall provide notice of this Temporary Injunction to her officers, agents, servants, employees, and attorneys, as well as any persons or entities in active concert or participation with Defendant.

IT IS FURTHER ORDERED that Plaintiffs' bond or cash deposit in lieu of bond is set in the amount of $1,000.

IT IS FURTHER ORDERED that, on the filing by Plaintiffs of the bond and on approving the bond according to law (or the cash deposit in lieu of bond), the Clerk shall issue a Temporary Injunction in conformity with the law and the terms of this order.

IT IS FURTHER ORDERED that this Temporary Injunction shall not expire until final judgment in this case is entered or this case is otherwise dismissed by this Court.

IT IS FURTHER ORDERED that the trial on Plaintiffs' *ultra vires* claims seeking declaratory relief, permanent injunctive relief, and mandamus relief is set for November 3, 2025.

SIGNED on October 4, 2024.

_____
JUDGE PRESIDING

**Judge Laurie Eiserloh**
**455th District Court**

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office On 11/01/2024 09:28:21

VELVA L. PRICE
DISTRICT CLERK
By Deputy: SH
169317251.2



**TAB 2: AUTHORITIES**

| Statutory Provision (Cite) | Relevant Statutory Text |
|---|---|
| Tex. Gov't Code § 536.052(a)<br><br>(current version at Tex. Gov't Code § 543A.0052) | (a) The commission **may** allow a managed care organization participating in the child health plan program or Medicaid increased flexibility to implement quality initiatives in a managed care plan offered by the organization, including flexibility with respect to financial arrangements, in order to:<br>    (1) achieve high-quality, cost-effective health care;<br>    (2) increase the use of high-quality, cost-effective delivery models;<br>    (3) reduce the incidence of unnecessary institutionalization and potentially preventable events; and<br>    (4) increase the use of alternative payment systems, including shared savings models, in collaboration with physicians and other health care providers.<br><br>(emphasis added) |
| Tex. Gov't Code § 536.052(b)<br><br>(current version at Tex. Gov't Code § 543A.0052) | (b) The commission shall develop quality of care and cost-efficiency benchmarks, including benchmarks based on a managed care organization's performance with respect to reducing potentially preventable events and containing the growth rate of health care costs. |
| Tex. Gov't Code § 536.052(d)<br><br>(current version at Tex. Gov't Code § 543A.0052) | (d) In awarding contracts to managed care organizations under the child health plan program and Medicaid, *the commission shall*, in addition to considerations under Section 533.003 of this code and Section 62.155, Health and Safety Code, *give preference to an organization that offers a managed care plan that successfully implements quality initiatives under Subsection (a)* **as determined by the commission** based on data or other evidence *provided by the organization* or meets quality of care and cost-efficiency benchmarks under Subsection (b).<br><br>(emphases added) |
| Tex. Gov't Code § 533.0035(a)<br><br>(current version at Tex. Gov't Code § 540.0203) | (a) Before the commission may award a contract under this chapter to a managed care organization, the commission shall evaluate and certify that the organization is **reasonably able to fulfill the terms** of the contract, including all requirements of applicable federal and state law. |

| | (emphasis added) |
|---|---|
| Tex. Gov't Code § 533.002<br><br>(current version at Tex. Gov't Code § 540.0051) | The commission shall implement the Medicaid managed care program by contracting with managed care organizations in a manner that, *to the extent possible*:<br>    (1) improves the health of Texans by:<br>        (A) emphasizing prevention;<br>        (B) *promoting continuity of care*; and<br>        (C) *providing a medical home* for recipients;<br>    (2) ensures that each recipient receives high quality, comprehensive health care services in the recipient's local community;<br>    (3) encourages the training of and access to primary care physicians and providers;<br>    (4) maximizes cooperation with existing public health entities, including local departments of health;<br>    (5) provides incentives to managed care organizations to improve the quality of health care services for recipients by providing value-added services; and<br>    (6) *reduces administrative and other nonfinancial barriers* for recipients in obtaining health care services.<br><br>(emphases added) |
| Tex. Gov't Code § 533.003(a)<br><br>(current version at Tex. Gov't Code § 540.0204) | (a) In awarding contracts to managed care organizations, the commission shall:<br>    (1) give preference to organizations that have *significant participation in the organization's provider network from each health care provider in the region* who has traditionally provided care to Medicaid and charity care patients;<br>    . . .<br>    (3) consider the need to use different managed care plans to meet the needs of different populations . . . .<br><br>(emphasis added) |
| Tex. Gov't Code § 533.004(a)(2)<br><br>(current version at Tex. Gov't Code § 540.0206) | (a) Subject to the considerations required under Section 533.003 and the certification required under Section 533.0035, in providing health care services through Medicaid managed care to recipients in a health care service region, the commission *shall contract* with a managed care organization in that region that is licensed under Chapter 843, Insurance Code, to provide health care in that region and that is:<br>    . . .<br>    (2) created by a nonprofit corporation that: |

| | |
|---|---|
| | (A) has a contract, agreement, or other arrangement with a hospital district in that region or with a municipality in that region that owns a hospital licensed under Chapter 241, Health and Safety Code, and has an obligation to provide health care to indigent patients; and<br>(B) under the contract, agreement, or other arrangement, assumes the obligation to provide health care to indigent patients and leases, manages, or operates a hospital facility owned by the hospital district or municipality; . . . .<br><br>(emphasis added) |
| Tex. Gov't Code § 2155.144(c)-(d) | (c) An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human Services Commission that provides the best value to the agency. The agency *shall document* that it considered all relevant factors under Subsection (d) in making the acquisition.<br><br>(d) Subject to Subsection (e), the agency *may consider* all relevant factors in determining the best value . . . .<br><br>(emphases added) |
| Tex. Health & Safety Code § 62.051(e) | (e) The commission shall conduct a review of each entity that enters into a contract under Section 62.055 or 62.155 to ensure that the entity is available, prepared, and able to fulfill the entity's obligations under the contract in compliance with the contract, this chapter, and rules adopted under this chapter. |
| Tex. Health & Safety Code § 62.055 | (a) It is the intent of the legislature that the commission maximize the use of private resources in administering the child health plan created under this chapter. In administering the child health plan, *the commission may contract with a third party administrator to provide enrollment and related services* under the state child health plan.<br>. . .<br>(f) The commission shall:<br>    (1) procure all contracts with a third party administrator through a competitive procurement process in compliance with all applicable federal and state laws or regulations; and<br>    (2) ensure that all contracts with child health plan providers under Section 62.155 are procured through a competitive procurement |

| | |
|---|---|
| | process in compliance with all applicable federal and state laws or regulations.<br><br>(emphasis added) |
| Tex. Health & Safety Code § 62.155 | (a) The commission shall select the health plan providers under the program through a competitive procurement process. . . .<br><br>. . .<br><br>(c) In selecting a health plan provider, the commission:<br>    (1) *may give preference to a person who provides similar coverage under the Medicaid program* . . . .<br><br>(emphasis added) |
| 1 Tex. Admin. Code § 391.101 | The purpose of these rules is to:<br>    (1) provide transparency to the public, the legislature, state agencies, and vendors on the procedures followed by HHSC procurement personnel;<br>    (2) provide for consistent and uniform management of procurement and contracting processes; and<br>    (3) obtain best value when purchasing goods and services to better serve Texas residents and businesses. |
| 1 Tex. Admin. Code § 391.209 | (3) Evaluation and selection. HHSC utilizes an evaluation method which provides for:<br>    (A) *the fair consideration of proposals*; and<br>    (B) if applicable, a process for determining the competitive range.<br><br>(emphasis added) |
| 1 Tex. Admin. Code § 391.307(d) | (d) The protestant may appeal the Deputy Executive Commissioner of Procurement and Contracting Services' determination on a protest to the HHSC Executive Commissioner. The appeal must be in writing and submitted by electronic mail . . . no later than 10 business days after the date of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The appeal shall be limited to review of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The protestant must mail or deliver copies of the appeal to other interested parties, and each copy must contain a certified statement that such copies have been provided.<br>    (1) A protest or appeal that is not timely filed shall not be considered unless good cause for delay is shown or the HHSC Executive Commissioner determines that an appeal raises issues that are significant to HHSC's procurement practices or procedures in general.<br>    . . . |

| | |
|---|---|
| | (3) The HHSC Executive Commissioner will review the appeal of the Deputy Executive Commissioner of Procurement and Contracting Services' determination and render a final decision on the protest issues.<br><br>(4) A decision issued in writing by the HHSC Executive Commissioner shall be the final administrative action of HHSC on a protest determination that is appealed under this subchapter. |

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 536. Medicaid and the Child Health Plan Program: Quality-Based Outcomes and Payments
          Subchapter B. Quality-Based Payments Relating to Managed Care Organizations

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 536.052

§ 536.052. Payment and Contract Award Incentives for Managed Care Organizations

(a) The commission may allow a managed care organization participating in the child health plan program or Medicaid increased flexibility to implement quality initiatives in a managed care plan offered by the organization, including flexibility with respect to financial arrangements, in order to:

  (1) achieve high-quality, cost-effective health care;

  (2) increase the use of high-quality, cost-effective delivery models;

  (3) reduce the incidence of unnecessary institutionalization and potentially preventable events; and

  (4) increase the use of alternative payment systems, including shared savings models, in collaboration with physicians and other health care providers.

(b) The commission shall develop quality of care and cost-efficiency benchmarks, including benchmarks based on a managed care organization's performance with respect to reducing potentially preventable events and containing the growth rate of health care costs.

(c) The commission may include in a contract between a managed care organization and the commission financial incentives that are based on the organization's successful implementation of quality initiatives under Subsection (a) or success in achieving quality of care and cost-efficiency benchmarks under Subsection (b).

(d) In awarding contracts to managed care organizations under the child health plan program and Medicaid, the commission shall, in addition to considerations under Section 533.003 of this code and Section 62.155, Health and Safety Code, give preference to an organization that offers a managed care plan that successfully implements quality initiatives under Subsection (a) as determined by the commission based on data or other evidence provided by the organization or meets quality of care and cost-efficiency benchmarks under Subsection (b).

(e) The commission may implement financial incentives under this section only if implementing the incentives would be cost-effective.

**Credits**

Added by Acts 2011, 82nd Leg., 1st C.S., ch. 7 (S.B. 7), § 1.12(a), eff. Sept. 28, 2011. Amended by Acts 2013, 83rd Leg., ch. 1310 (S.B. 7), § 4.13, eff. Sept. 1, 2013; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.265, eff. April 2, 2015; Acts 2015, 84th Leg., ch. 837 (S.B. 200), § 3.25, eff. Jan. 1, 2016; Acts 2015, 84th Leg., ch. 946 (S.B. 277), § 2.25, eff. Jan. 1, 2016.

V. T. C. A., Government Code § 536.052, TX GOVT § 536.052
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)
This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.0035

§ 533.0035. Certification by Commission

(a) Before the commission may award a contract under this chapter to a managed care organization, the commission shall evaluate and certify that the organization is reasonably able to fulfill the terms of the contract, including all requirements of applicable federal and state law.

(b) Notwithstanding any other law, the commission may not award a contract under this chapter to a managed care organization that does not receive the certification required under this section.

(c) A managed care organization may appeal a denial of certification by the commission under this section.

**Credits**

Added by Acts 2021, 87th Leg., ch. 609 (S.B. 1244), § 1, eff. Sept. 1, 2021.

V. T. C. A., Government Code § 533.0035, TX GOVT § 533.0035
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated

Government Code (Refs & Annos)

Title 4. Executive Branch (Refs & Annos)

Subtitle I. Health and Human Services

Chapter 533. Medicaid Managed Care Program (Refs & Annos)

Subchapter A. General Provisions (Refs & Annos)

This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.002

§ 533.002. Purpose

The commission shall implement the Medicaid managed care program by contracting with managed care organizations in a manner that, to the extent possible:

(1) improves the health of Texans by:

(A) emphasizing prevention;

(B) promoting continuity of care; and

(C) providing a medical home for recipients;

(2) ensures that each recipient receives high quality, comprehensive health care services in the recipient's local community;

(3) encourages the training of and access to primary care physicians and providers;

(4) maximizes cooperation with existing public health entities, including local departments of health;

(5) provides incentives to managed care organizations to improve the quality of health care services for recipients by providing value-added services; and

(6) reduces administrative and other nonfinancial barriers for recipients in obtaining health care services.

**Credits**

Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.210, eff. April 2, 2015.

V. T. C. A., Government Code § 533.002, TX GOVT § 533.002
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)
            This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.003

§ 533.003. Considerations in Awarding Contracts

(a) In awarding contracts to managed care organizations, the commission shall:

(1) give preference to organizations that have significant participation in the organization's provider network from each health care provider in the region who has traditionally provided care to Medicaid and charity care patients;

(2) give extra consideration to organizations that agree to assure continuity of care for at least three months beyond the period of Medicaid eligibility for recipients;

(3) consider the need to use different managed care plans to meet the needs of different populations;

(4) consider the ability of organizations to process Medicaid claims electronically; and

(5) in the initial implementation of managed care in the South Texas service region, give extra consideration to an organization that either:

(A) is locally owned, managed, and operated, if one exists; or

(B) is in compliance with the requirements of Section 533.004.

(b) The commission, in considering approval of a subcontract between a managed care organization and a pharmacy benefit manager for the provision of prescription drug benefits under Medicaid, shall review and consider whether the pharmacy benefit manager has been in the preceding three years:

(1) convicted of an offense involving a material misrepresentation or an act of fraud or of another violation of state or federal criminal law;

(2) adjudicated to have committed a breach of contract; or

(3) assessed a penalty or fine in the amount of $500,000 or more in a state or federal administrative proceeding.

**Credits**

Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 1999, 76th Leg., ch. 1447, § 2, eff. June 19, 1999; Acts 1999, 76th Leg., ch. 1460, § 9.02, eff. Sept. 1, 1999; Acts 2011, 82nd Leg., 1st C.S., ch. 7 (S.B. 7), § 1.02(c), eff. Sept. 28, 2011; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 2.221, eff. April 2, 2015.

V. T. C. A., Government Code § 533.003, TX GOVT § 533.003
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document** <span style="float:right">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 4. Executive Branch (Refs & Annos)
      Subtitle I. Health and Human Services
        Chapter 533. Medicaid Managed Care Program (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)
            This section has been updated. Click here for the updated version.

V.T.C.A., Government Code § 533.004

§ 533.004. Mandatory Contracts

(a) Subject to the considerations required under Section 533.003 and the certification required under Section 533.0035, in providing health care services through Medicaid managed care to recipients in a health care service region, the commission shall contract with a managed care organization in that region that is licensed under Chapter 843, Insurance Code, to provide health care in that region and that is:

(1) wholly owned and operated by a hospital district in that region;

(2) created by a nonprofit corporation that:

(A) has a contract, agreement, or other arrangement with a hospital district in that region or with a municipality in that region that owns a hospital licensed under Chapter 241, Health and Safety Code, and has an obligation to provide health care to indigent patients; and

(B) under the contract, agreement, or other arrangement, assumes the obligation to provide health care to indigent patients and leases, manages, or operates a hospital facility owned by the hospital district or municipality; or

(3) created by a nonprofit corporation that has a contract, agreement, or other arrangement with a hospital district in that region under which the nonprofit corporation acts as an agent of the district and assumes the district's obligation to arrange for services under the Medicaid expansion for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session, 1995.

(b) A managed care organization described by Subsection (a) is subject to all terms and conditions to which other managed care organizations are subject, including all contractual, regulatory, and statutory provisions relating to participation in the

Medicaid managed care program.

(c) The commission shall make the awarding and renewal of a mandatory contract under this section to a managed care organization affiliated with a hospital district or municipality contingent on the district or municipality entering into a matching funds agreement to expand Medicaid for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session, 1995. The commission shall make compliance with the matching funds agreement a condition of the continuation of the contract with the managed care organization to provide health care services to recipients.

(d) Subsection (c) does not apply if:

(1) the commission does not expand Medicaid for children as authorized by Chapter 444, Acts of the 74th Legislature, Regular Session, 1995; or

(2) a waiver from a federal agency necessary for the expansion is not granted.

(e) In providing health care services through Medicaid managed care to recipients in a health care service region, with the exception of the Harris service area for the STAR Medicaid managed care program, as defined by the commission as of September 1, 1999, the commission shall also contract with a managed care organization in that region that holds a certificate of authority as a health maintenance organization under Chapter 843, Insurance Code, and that:

(1) is certified under Section 162.001, Occupations Code;

(2) is created by The University of Texas Medical Branch at Galveston; and

(3) has obtained a certificate of authority as a health maintenance organization to serve one or more counties in that region from the Texas Department of Insurance before September 2, 1999.

**Credits**

Added by Acts 1997, 75th Leg., ch. 1262, § 2, eff. June 20, 1997. Amended by Acts 1999, 76th Leg., ch. 1447, § 3, eff. June 19, 1999; Acts 1999, 76th Leg., ch. 1460, § 9.03, eff. Sept. 1, 1999; Acts 2001, 77th Leg., ch. 1420, § 14.766, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 1276, § 10A.515, eff. Sept. 1, 2003; Acts 2021, 87th Leg., ch. 609 (S.B. 1244), § 2, eff. Sept. 1, 2021.

V. T. C. A., Government Code § 533.004, TX GOVT § 533.004
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle D. State Purchasing and General Services (Refs & Annos)
        Chapter 2155. Purchasing: General Rules and Procedures (Refs & Annos)
          Subchapter C. Delegations of and Exclusions from Comptroller's Purchasing Authority and Certain Exemptions from Competitive Bidding

V.T.C.A., Government Code § 2155.144

## § 2155.144. Procurements by Health and Human Services Agencies

Currentness

(a) This section applies only to the Health and Human Services Commission, each health and human services agency, the Department of Family and Protective Services, and agencies administratively attached to the Health and Human Services Commission. For the purposes of this section, the Department of Family and Protective Services or an agency administratively attached to the Health and Human Services Commission is considered a health and human services agency.

(b) An agency to which this section applies is delegated the authority to procure its goods and services, except as provided by this section.

(b-1) An agency to which this section applies is not delegated the authority to procure common commodities or services:

(1) including goods and services acquired for direct consumption or use by the agency in the day-to-day support of the agency's administrative operations, such as office supplies and equipment, building maintenance and cleaning services, or temporary employment services; and

(2) not including consulting services, professional services, health care services, information resources technology, goods or services acquired for the benefit or on behalf of clients of programs operated by the agency, procurements specifically authorized or delegated to the agency by statute, or the contracting out of agency purchasing functions or other administrative or program functions.

(b-2) The Health and Human Services Commission is delegated the authority to procure goods and services related to a contract for:

(1) a project to construct or expand a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code; or

(2) a deferred maintenance project for a health facility described by Subdivision (1).

(b-3) Notwithstanding any other law, the Texas Civil Commitment Office is delegated the authority to procure common commodities or services described by Subsection (b-1)(1) for office use if the total cost of the purchase is less than the total cost of the purchase under the comptroller's purchasing authority or as offered for sale as provided by Chapter 122, Human Resources Code. The Texas Civil Commitment Office, in collaboration with the comptroller, shall identify best practices for comparing the total costs and documenting cost savings.

(c) An agency to which this section applies shall acquire goods or services by any procurement method approved by the Health and Human Services Commission that provides the best value to the agency. The agency shall document that it considered all relevant factors under Subsection (d) in making the acquisition.

(d) Subject to Subsection (e), the agency may consider all relevant factors in determining the best value, including:

(1) any installation costs;

(2) the delivery terms;

(3) the quality and reliability of the vendor's goods or services;

(4) the extent to which the goods or services meet the agency's needs;

(5) indicators of probable vendor performance under the contract such as past vendor performance, the vendor's financial resources and ability to perform, the vendor's experience and responsibility, and the vendor's ability to provide reliable maintenance agreements;

(6) the impact on the ability of the agency to comply with laws and rules relating to historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities;

(7) the total long-term cost to the agency of acquiring the vendor's goods or services;

(8) the cost of any employee training associated with the acquisition;

(9) the effect of an acquisition on agency productivity;

(10) the acquisition price; and

(11) any other factor relevant to determining the best value for the agency in the context of a particular acquisition.

(e) Repealed by Acts 2003, 78th Leg., ch. 785, § 75(2).

(f) The state auditor may audit the agency's acquisitions of goods and services before or after a warrant is issued to pay for an acquisition.

(g) The agency may adopt rules and procedures for the acquisition of goods and services under this section.

(h) The Health and Human Services Commission shall adopt rules and procedures for the acquisition of goods and services under this section that apply to all health and human services agencies, including rules adopted with the commission's assistance that allow an agency to make purchases through a group purchasing program except when a better value is available through another procurement method. The rules of the health and human services agencies must be consistent with the rules of the Health and Human Services Commission.

(i) Subject to Section 524.0001(b), the Health and Human Services Commission shall develop a single statewide risk analysis procedure. Each health and human services agency shall comply with the procedure. The procedure must provide for:

(1) assessing the risk of fraud, abuse, or waste in health and human services agencies contractor selection processes, contract provisions, and payment and reimbursement rates and methods for the different types of goods and services for which health and human services agencies contract;

(2) identifying contracts that require enhanced contract monitoring; and

(3) coordinating contract monitoring efforts among health and human services agencies.

(j) Subject to Section 524.0001(b), the Health and Human Services Commission shall publish a contract management handbook that establishes consistent contracting policies and practices to be followed by health and human services agencies. The handbook may include standard contract provisions and formats for health and human services agencies to incorporate as applicable in their contracts.

(k) Subject to Section 524.0001(b), the Health and Human Services Commission, in cooperation with the comptroller, shall establish a central contract management database that identifies each contract made with a health and human services agency. The comptroller may use the database to monitor health and human services agency contracts, and health and human services agencies may use the database in contracting. A state agency shall send to the comptroller in the manner prescribed by the comptroller the information the agency possesses that the comptroller requires for inclusion in the database.

(l) The Health and Human Services Commission shall coordinate the procurement practices of all health and human services agencies and encourage those agencies to use efficient procurement practices such as the use of a group purchasing program, combining maintenance contracts into one contract, and obtaining prompt payment discounts. In implementing this duty, the Health and Human Services Commission may review the procurement and rate-setting procedures of each health and human services agency to ensure that amounts paid to contractors are consistent and represent the best value for the state. The Health and Human Services Commission may disapprove a procurement and rate-setting procedure of a health and human services agency. A health and human services agency may not use a procurement or rate-setting procedure that has been disapproved by the commission. The Health and Human Services Commission may transfer the procurement functions of a health and human services agency to another appropriate state agency if it determines that transferring those functions would be advantageous to the state. Other state agencies and institutions with experience in acquiring goods and services using the procedures allowed under Subsections (c) and (d) shall on request assist the Health and Human Services Commission to perform its functions under this section.

(m) Subject to Section 524.0001(b), the Health and Human Services Commission shall develop and implement a statewide plan to ensure that each entity that contracts with a health and human services agency and any subcontractor of the entity complies with the accessibility requirements of the Americans with Disabilities Act of 1990 (42 U.S.C. Section 12101 et seq.).

(n) To the extent of any conflict, this section prevails over any other state law relating to the procurement of goods and services except a law relating to contracting with historically underutilized businesses or relating to the procurement of goods and services from persons with disabilities.

(o) If the Health and Human Services Commission does not receive any responsive bids on a competitive solicitation for goods or services for a state hospital operated by a health and human services agency or a state supported living center as defined by Section 531.002, Health and Safety Code, the commission after making a written determination that competition is not available may negotiate with and award the contract to any qualified vendor who meets the requirements of the original solicitation:

    (1) at a price consistent with the current market value of the goods or services; and

(2) for a term not to exceed five years.

(p) In this section, "health and human services agency" has the meaning assigned by Section 521.0001.

**Credits**

Added by Acts 1997, 75th Leg., ch. 1045, § 1, eff. Sept. 1, 1997. Amended by Acts 1999, 76th Leg., ch. 1460, § 3.11, eff. Sept. 1, 1999; Acts 2003, 78th Leg., ch. 309, § 7.07, eff. June 18, 2003; Acts 2003, 78th Leg., ch. 785, § 75(2), eff. Sept. 1, 2003; Acts 2007, 80th Leg., ch. 937, § 1.09, eff. Sept. 1, 2007; Acts 2015, 84th Leg., ch. 837 (S.B. 200), § 2.08(b)(3), eff. Sept. 1, 2015; Acts 2019, 86th Leg., ch. 953 (S.B. 65), § 16, eff. Sept. 1, 2019; Acts 2021, 87th Leg., ch. 621 (S.B. 1896), § 15, eff. June 14, 2021; Acts 2021, 87th Leg., ch. 855 (S.B. 799), § 9, eff. Sept. 1, 2021; Acts 2023, 88th Leg., ch. 351 (S.B. 1179), § 17, eff. Sept. 1, 2023; Acts 2023, 88th Leg., ch. 769 (H.B. 4611), § 2.20, eff. April 1, 2025; Acts 2025, 89th Leg., ch. 1145 (S.B. 1610), § 27, eff. Sept. 1, 2025.

V. T. C. A., Government Code § 2155.144, TX GOVT § 2155.144
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
    Health and Safety Code (Refs & Annos)
        Title 2. Health
            Subtitle C. Programs Providing Health Care Benefits and Services
                Chapter 62. Child Health Plan for Certain Low-Income Children (Refs & Annos)
                    Subchapter B. Administration of Child Health Plan Program

V.T.C.A., Health & Safety Code § 62.051

§ 62.051. Duties of Executive Commissioner and Commission in General

Currentness

(a) The executive commissioner shall administer a state-designed child health plan program to obtain health benefits coverage for children in low-income families. The executive commissioner shall ensure that the child health plan program is designed and administered in a manner that qualifies for federal funding under Title XXI of the Social Security Act (42 U.S.C. Section 1397aa et seq.), as amended, and any other applicable law or regulations.

(b) The executive commissioner is responsible for making policy for the child health plan program, including policy related to covered benefits provided under the child health plan. The executive commissioner may not delegate this duty to another agency or entity.

(c) The executive commissioner shall oversee the implementation of the child health plan program and coordinate the activities of each agency necessary to the implementation of the program, including the Texas Department of Insurance.

(d) The executive commissioner shall adopt rules as necessary to implement this chapter.

(e) The commission shall conduct a review of each entity that enters into a contract under Section 62.055 or 62.155 to ensure that the entity is available, prepared, and able to fulfill the entity's obligations under the contract in compliance with the contract, this chapter, and rules adopted under this chapter.

(f) The commission shall ensure that the amounts spent for administration of the child health plan program do not exceed any limit on those expenditures imposed by federal law.

**Credits**

Added by Acts 1999, 76th Leg., ch. 235, § 1, eff. Aug. 30, 1999. Amended by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.0192, eff. April 2, 2015.

V. T. C. A., Health & Safety Code § 62.051, TX HEALTH & S § 62.051
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document**© 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Proposed Legislation
Vernon's Texas Statutes and Codes Annotated
　Health and Safety Code (Refs & Annos)
　　Title 2. Health
　　　Subtitle C. Programs Providing Health Care Benefits and Services
　　　　Chapter 62. Child Health Plan for Certain Low-Income Children (Refs & Annos)
　　　　　Subchapter B. Administration of Child Health Plan Program

V.T.C.A., Health & Safety Code § 62.055

§ 62.055. Contracts for Implementation of Child Health Plan

Currentness

(a) It is the intent of the legislature that the commission maximize the use of private resources in administering the child health plan created under this chapter. In administering the child health plan, the commission may contract with a third party administrator to provide enrollment and related services under the state child health plan.

(b), (c) Repealed by Acts 2003, 78th Leg., ch. 198, § 2.156(a)(1).

(d) Repealed by Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.1639(23).

(e) The executive commissioner shall retain all policymaking authority over the state child health plan.

(f) The commission shall:

(1) procure all contracts with a third party administrator through a competitive procurement process in compliance with all applicable federal and state laws or regulations; and

(2) ensure that all contracts with child health plan providers under Section 62.155 are procured through a competitive procurement process in compliance with all applicable federal and state laws or regulations.

**Credits**

Added by Acts 1999, 76th Leg., ch. 235, § 1, eff. Aug. 30, 1999. Amended by Acts 2003, 78th Leg., ch. 198, §§ 2.43, 2.156(a)(1), eff. Sept. 1, 2003; Acts 2015, 84th Leg., ch. 1 (S.B. 219), §§ 3.0195, 3.1639(23), eff. April 2, 2015.

V. T. C. A., Health & Safety Code § 62.055, TX HEALTH & S § 62.055
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
    Health and Safety Code (Refs & Annos)
        Title 2. Health
            Subtitle C. Programs Providing Health Care Benefits and Services
                Chapter 62. Child Health Plan for Certain Low-Income Children (Refs & Annos)
                    Subchapter D. Child Health Plan

V.T.C.A., Health & Safety Code § 62.155

§ 62.155. Health Plan Providers

Currentness

(a) The commission shall select the health plan providers under the program through a competitive procurement process. A health plan provider, other than a state administered primary care case management network, must hold a certificate of authority or other appropriate license issued by the Texas Department of Insurance that authorizes the health plan provider to provide the type of child health plan offered and must satisfy, except as provided by this chapter, any applicable requirement of the Insurance Code or another insurance law of this state.

(b) A managed care organization or other entity shall seek to obtain, in the organization's or entity's provider network, the participation of significant traditional providers, as defined by commission rule, if that organization or entity:

(1) contracts with the commission or with another agency or entity to operate a part of the child health plan under this chapter; and

(2) uses a provider network to provide or arrange for health care services under the child health plan.

(c) In selecting a health plan provider, the commission:

(1) may give preference to a person who provides similar coverage under the Medicaid program; and

(2) shall provide for a choice of at least two health plan providers in each service area.

(d) The executive commissioner may authorize an exception to Subsection (c)(2) if there is only one acceptable applicant to become a health plan provider in the service area.

**Credits**

Added by Acts 1999, 76th Leg., ch. 235, § 1, eff. Aug. 30, 1999. Amended by Acts 2003, 78th Leg., ch. 198, § 2.52, eff. Sept. 1, 2003; Acts 2015, 84th Leg., ch. 1 (S.B. 219), § 3.0205, eff. April 2, 2015.

V. T. C. A., Health & Safety Code § 62.155, TX HEALTH & S § 62.155
Current through the end of the 2025 Regular, First Called and Chapters 2 through 4 of the Second Called Sessions of the 89th Legislature.

End of Document     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
        Subchapter A. General Provisions

1 TAC § 391.101

§ 391.101. Purpose

Currentness

The purpose of these rules is to:

(1) provide transparency to the public, the legislature, state agencies, and vendors on the procedures followed by HHSC procurement personnel;

(2) provide for consistent and uniform management of procurement and contracting processes; and

(3) obtain best value when purchasing goods and services to better serve Texas residents and businesses.

**Credits**

**Source:** The provisions of this §391.101 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

Current through 50 Tex.Reg. No. 5502, dated August 22, 2025, as effective on or before August 29, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.101, 1 TX ADC § 391.101

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 1. Administration
    Part 15. Texas Health and Human Services Commission
      Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission
        Subchapter B. Procurement and Special Contracting Methods
          Division 1. Procurement Methods

1 TAC § 391.209

§ 391.209. Request for Proposals

Currentness

Goods or services may be purchased through a Request for Proposals (RFP) as authorized by this section.

(1) Advertisement. Public notice of the issuance of an RFP is posted on the Electronic State Business Daily in accordance with Texas Government Code §2155.083. The solicitation must include evaluation and selection criteria and the process for making a selection.

(2) Minor irregularities in a response. HHSC may waive a minor irregularity or permit a respondent to correct a minor irregularity in a response, if the irregularity:

(A) is purely a matter of form rather than substance; and

(B) does not materially affect price, quality, or delivery of the desired goods or services.

(3) Evaluation and selection. HHSC utilizes an evaluation method which provides for:

(A) the fair consideration of proposals; and

(B) if applicable, a process for determining the competitive range.

(4) Negotiations.

(A) HHS or DFPS may discuss acceptable or potentially acceptable proposals with respondents to assess a respondent's ability to meet the solicitation requirements.

(B) After receiving a proposal but before making an award, HHS or DFPS may permit the respondent to revise its proposal to obtain the best and final offer at any stage in the evaluation or negotiation process.

(5) Award. A contract is awarded to the respondent whose proposal offers the best value for the state in accordance with Texas Government Code §2155.144.

**Credits**

**Source:** The provisions of this §391.209 adopted to be effective May 12, 2021, 46 TexReg 3017; amended to be effective May 10, 2022, 47 TexReg 2732.

Current through 50 Tex.Reg. No. 5502, dated August 22, 2025, as effective on or before August 29, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.209, 1 TX ADC § 391.209

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

| Texas Administrative Code |
| --- |
| Title 1. Administration |
| Part 15. Texas Health and Human Services Commission |
| Chapter 391. Purchase of Goods and Services by the Texas Health and Human Services Commission |
| Subchapter C. Protests |

1 TAC § 391.307
Formerly cited as 1 TX ADC § 391.407

§ 391.307. Review and Disposition of Protests

Currentness

(a) Upon receipt of a protest, the Deputy Executive Commissioner of Procurement and Contracting Services may:

(1) dismiss the protest if:

(A) it is not timely; or

(B) it does not meet the requirements of §391.305 of this subchapter (relating to Filing of a Protest);

(2) solicit written responses to the protest from other interested parties; or

(3) attempt to resolve the protest by mutual agreement.

(b) The Deputy Executive Commissioner of Procurement and Contracting Services may confer with the HHSC Chief Counsel at any time during the review of the protest.

(c) If the protest is not dismissed or resolved by mutual agreement, the Deputy Executive Commissioner of Procurement and Contracting Services will issue a written determination on the protest.

(1) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that no violation of the specific statutory or regulatory provision cited by the protestant has occurred, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination.

(2) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that HHS violated the specific statutory or regulatory provision cited by the protestant in a case where HHS has not awarded a contract, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination and any appropriate remedial action.

(3) If the Deputy Executive Commissioner of Procurement and Contracting Services determines that HHS violated the specific statutory or regulatory provision cited by the protestant in a case where HHS awarded a contract, they shall so inform the protestant and other interested parties by letter that sets forth the reasons for the determination, which may include ordering the contract void.

(4) The Deputy Executive Commissioner of Procurement and Contracting Services' written determination is the final administrative action by HHSC on a protest filed under this subchapter unless the protestant files an appeal of the determination under subsection (d) of this section.

(d) The protestant may appeal the Deputy Executive Commissioner of Procurement and Contracting Services' determination on a protest to the HHSC Executive Commissioner. The appeal must be in writing and submitted by electronic mail to HHSCExecutiveCommissioner@hhs.texas.gov no later than 10 business days after the date of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The appeal shall be limited to review of the Deputy Executive Commissioner of Procurement and Contracting Services' determination. The protestant must mail or deliver copies of the appeal to other interested parties, and each copy must contain a certified statement that such copies have been provided.

(1) A protest or appeal that is not timely filed shall not be considered unless good cause for delay is shown or the HHSC Executive Commissioner determines that an appeal raises issues that are significant to HHSC's procurement practices or procedures in general.

(2) The HHSC Executive Commissioner may confer with the HHSC Chief Counsel at any time during the review of the appeal.

(3) The HHSC Executive Commissioner will review the appeal of the Deputy Executive Commissioner of Procurement and Contracting Services' determination and render a final decision on the protest issues.

(4) A decision issued in writing by the HHSC Executive Commissioner shall be the final administrative action of HHSC on a protest determination that is appealed under this subchapter.

**Credits**

**Source:** The provisions of this §391.307 adopted to be effective May 12, 2021, 46 TexReg 3017.

Current through 50 Tex.Reg. No. 5502, dated August 22, 2025, as effective on or before August 29, 2025. Some sections may be more current. See credits for details.

1 TAC § 391.307, 1 TX ADC § 391.307

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nancy Villarreal on behalf of Cory Scanlon
Bar No. 24104599
nancy.villarreal@oag.texas.gov
Envelope ID: 106225735
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250929 Appellant Youngs Brief_Final
Status as of 9/30/2025 7:05 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Michaelle Peters | | mpeters@scottdoug.com | 9/29/2025 5:22:17 PM | SENT |
| Julie Wright | | julie.wright@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Amanda DoddsPrice | | amanda.price@squirepb.com | 9/29/2025 5:22:17 PM | SENT |
| Maria Williamson | | maria.williamson@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |
| Mandy Patterson | | mpatterson@adjtlaw.com | 9/29/2025 5:22:17 PM | SENT |
| Michelle Joyner | | mjoyner@scottdoug.com | 9/29/2025 5:22:17 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |
| Abril Rivera | | arivera@scottdoug.com | 9/29/2025 5:22:17 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |
| Cory Scanlon | | cory.scanlon@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |
| David Johns | | david@cobbjohns.com | 9/29/2025 5:22:17 PM | SENT |
| Jessie Johnson | | jessie.johnson@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Stacey Jett | | sjett@adjltaw.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Cook Children's Health Plan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Karen Burgess | 796276 | kburgess@burgesslawpc.com | 9/29/2025 5:22:17 PM | SENT |
| Anna Baker | 791362 | abaker@adjtlaw.com | 9/29/2025 5:22:17 PM | SENT |
| Amy Warr | 795708 | awarr@adjtlaw.com | 9/29/2025 5:22:17 PM | SENT |
| Juliana Bennington | | jbennington@perkinscoie.com | 9/29/2025 5:22:17 PM | SENT |
| Jonathan Hawley | | jhawley@perkinscoie.com | 9/29/2025 5:22:17 PM | ERROR |
| Trisha Marino | | tmarino@perkinscoie.com | 9/29/2025 5:22:17 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nancy Villarreal on behalf of Cory Scanlon
Bar No. 24104599
nancy.villarreal@oag.texas.gov
Envelope ID: 106225735
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250929 Appellant Youngs Brief_Final
Status as of 9/30/2025 7:05 AM CST

Associated Case Party: Cook Children's Health Plan

| | | | | |
|---|---|---|---|---|
| Trisha Marino | | tmarino@perkinscoie.com | 9/29/2025 5:22:17 PM | SENT |
| Katie Dolan-Galaviz | | kgalaviz@burgesslawpc.com | 9/29/2025 5:22:17 PM | SENT |
| Perkins Docketing Team | | DocketSEA@perkinscoie.com | 9/29/2025 5:22:17 PM | SENT |
| Matthew Gordon | | mgordon@perkinscoie.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Texas Children's Health Plan

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Emery | 24050564 | mark.emery@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Warren Huang | 796788 | warren.huang@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Paul Trahan | 24003075 | paul.trahan@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Susan Harris | 6876980 | susan.harris@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Thomas Coulter | 4885500 | tom.coulter@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |
| Kayla Ahmed | | kayla.ahmed@nortonrosefulbright.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Wellpoint Insurance Company

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Robert Johnson | 10786400 | rjohnson@foley.com | 9/29/2025 5:22:17 PM | SENT |
| Michelle Ku | 24071452 | mku@foley.com | 9/29/2025 5:22:17 PM | SENT |
| Kristin Hernandez | | kristin.hernandez@foley.com | 9/29/2025 5:22:17 PM | SENT |
| Stacey Obenhaus | | sobenhaus@foley.com | 9/29/2025 5:22:17 PM | SENT |
| Benjamin Grossman | | bjgrossman@foley.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Superior Healthplan Inc.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nancy Villarreal on behalf of Cory Scanlon
Bar No. 24104599
nancy.villarreal@oag.texas.gov
Envelope ID: 106225735
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250929 Appellant Youngs Brief_Final
Status as of 9/30/2025 7:05 AM CST

Associated Case Party: Superior Healthplan Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Richard Phillips | 24032833 | Rich.Phillips@hklaw.com | 9/29/2025 5:22:17 PM | SENT |
| J McCaig | 24070083 | meghan.mccaig@outlook.com | 9/29/2025 5:22:17 PM | SENT |
| Karen Walker | | karen.walker@hklaw.com | 9/29/2025 5:22:17 PM | SENT |
| Tiffany Roddenberry | | tiffany.roddenberry@hklaw.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Texas Health and Human Services

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Victoria Gomez | | victoria.gomez@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |
| Jennifer Cook | | Jennifer.Cook@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Molina Healthcare of Texas, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cheryl LaFond | 24104015 | clafond@scottdoug.com | 9/29/2025 5:22:17 PM | SENT |
| Jason R.LaFond | | jlafond@scottdoug.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Aetna Better Health of Texas, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Joseph Knight | 11601275 | jknight@ebbklaw.com | 9/29/2025 5:22:17 PM | SENT |

Associated Case Party: Cecile Erwin Young, Texas Health and Human Services

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Nancy Villarreal on behalf of Cory Scanlon
Bar No. 24104599
nancy.villarreal@oag.texas.gov
Envelope ID: 106225735
Filing Code Description: Brief Requesting Oral Argument
Filing Description: 20250929 Appellant Youngs Brief_Final
Status as of 9/30/2025 7:05 AM CST

Associated Case Party: Cecile Erwin Young, Texas Health and Human Services

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Cory Scanlon | 24104599 | cory.scanlon@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |
| Jeffrey Stephens | | jeff.stephens@oag.texas.gov | 9/29/2025 5:22:17 PM | SENT |